[L. A. No. 25138. In Bank. Nov. 25, 1958.]

JAMES IRIART, Plaintiff and Appellant, v. SOUTHWEST FERTILIZER AND CHEMICAL COMPANY (a Partnership) et al., Defendants and Appellants; B. F. KNAPP et al., Interveners and Appellants.

Dickinson, Sattinger & McKee and Lewis A. Plourd for Plaintiff and Appellant.

Horton, Knox & Carter, James H. Carter and Robert W. Rotherford for Defendants and Appellants.

Whitelaw & Whitelaw and Dorsey Whitelaw for Interveners and Appellants.

SHENK, J.—This appeal involves the title to $15,412.46 held by Imperial Valley Ginning Company on February 18, 1954. The ginning company claims no part thereof but refuses to pay out any portion because of the conflicting claims asserted by the parties to this action. Plaintiff Iriart, lessor, claims that $15,312.58 of this sum represents the proceeds of the cotton which was delivered to him at the gin by Hillhouse, the grower-lessee, in payment of rent, pursuant to the terms of their written lease, and that this cotton was sold for his account at his direction by the ginning company. Defendants B. J. Kerley, Sr. and Daniel J. Kerley, doing business as Southwest Fertilizer and Chemical Company, a copartnership, creditors of Hillhouse, claim the entire amount by virtue of an attachment levied on February 18, 1954. The Knapps, plaintiffs in intervention, also creditors of Hillhouse, claim the entire amount under alternative theories, namely, rights under a crop mortgage, rights under an alleged equitable assignment, and rights under a trust agreement.

The determination of the Iriart and Southwest claims depends upon whether there was a segregation at the ginning company of one-fourth of the cotton crop in favor of Iriart and whether he waived his right to receive one-fourth of the proceeds, gross or net. The Knapps' claim rests upon a crop mortgage executed to them by Hillhouse to secure other debts and the facts surrounding their relinquishment of the lien of this mortgage prior to the date of the attachment. The trial court found no merit in the Knapps' claim and held they were not entitled to any part of the disputed fund. It found that there had been a segregation to Iriart of one-fourth of the cotton at the gin but that he had by waiver retained only a right to one-fourth of the net proceeds. He was

awarded $3,853.12, representing one-fourth of the net proceeds held on February 18, 1954. The balance of the disputed fund or $11,559.34 was awarded to Southwest. Each of the parties has appealed, challenging the sufficiency of the evidence to support the findings and the award.

On March 17, 1953, by an unrecorded writing Iriart leased 300 acres to Hillhouse for one year. The lease provided that the lessee will "sow said premises to cotton, and will harvest the same at his own cost, charge and expense, as soon as the same is suitable for harvesting. That He will, immediately upon harvesting all cotton of every description raised on said premises, and as ginned, divide the same at the Gin, and twenty-five percent (25%) part thereof for the party of the first part [Iriart] shall be as and for the yearly rental, and as the property of the party of the first part; but the party of the second part [Hillhouse] shall upon request, haul the same to the gin free of cost to the party of the first part. And all cotton thereon shall in like manner be divided at the gin, as baled, and twenty-five per cent (25%) portion thereof set apart to the party of the first part, as his property and be hauled, upon request by the party of the second part, to be set aside as the cotton of the party of the first part without charge, of any kind, to the party of the first part." The following paragraph provided that "Party of the first part agrees to execute a waiver in the usual form so that the cotton crop can be financed by Second party up to the sum of $30,000.00."

The cotton crop was grown and harvested and was taken to the gin on various dates commencing October 23, 1953, and ending February 22, 1954. When received it was ginned and baled, and held by the ginning company until it received instructions to sell it. Mr. Reed, secretary-treasurer of the ginning company, testified that at the time of harvesting Iriart showed him a copy of the lease and said he wanted his cotton sold at the same time as Hillhouse, to let the cotton go without separation, to let his portion of the cotton go to the sale of Mr. Hillhouse's cotton and it would be so recorded, and to hold his, Iriart's, share of the rent. Reed testified that it was their custom to deposit all moneys received from the sale of cotton in the company's general banking account; that where a landlord had an interest in the cotton grown and instructed them to let his share of the cotton go at the time the sale was made by the grower, at whatever price the grower agreed upon, they would credit the entire proceeds to the

grower's account for convenient accounting and after the deduction of their advances would pay a portion to the landlord and a portion to the grower. He stated that, "It is just usually on the instructions of the interested parties, is the way we handle it." With reference to this particular transaction Reed said that no actual segregation of the cotton was made at the gin, that Iriart said to let his go without any separation, and explained that this "is much easier than to try to identify each separate bale, because you run into different grades and weight and so forth. Of course, some landlords may decide they want to hold their cotton for a period of time, and under those cases we will take out specific bales of cotton for him to be held for his account." When asked if he had received any instructions from anyone as to how the money received from this cotton was to be paid out, he replied "Well . . . I guess the only way I can answer that is probably in discussing with Mr. Iriart, he would probably ascertain how much rent he had coming or something like that . . . I believe Mr. Iriart may have asked for the money, and I advised him that we had been advised by our attorney to hold the money for the decision of the court." When asked with reference to the time before January 14th, he replied, "Well, there wasn't sufficient amount of money to satisfy our growing advances against the crop . . . advances had not been satisfied so there would be no money to pay out."

The date of January 14, 1954, refers to the date upon which plaintiffs in intervention, the Knapps, advised the ginning company of their mortgage on the cotton crop, left a copy of the mortgage with it, and requested that the proceeds of further harvested cotton be held for their account. This mortgage was executed on April 3, 1953, by Hillhouse, and recorded May 4, 1953, as additional security for the payment by him of a $5,500 promissory note due April 4, 1954, and as additional security for the payment of a promissory note payable to the First National Bank, of Madera, in the sum of $12,579.50 due January 15, 1954. Hillhouse was the maker of this note and Knapp the guarantor. On or about January 12, 1954, Knapp visited Hillhouse and stated that he would not be able to meet the note when it became due on January 15th. At that time about 180 acres of cotton remained unpicked. Knapp authorized Hillhouse to harvest and sell this in the latter's name and to credit the proceeds to cover the crop mortgage, either by paying the bank direct or by paying Knapp, who would then pay the bank. On March 26, 1954,

upon demand made by the bank, Knapp paid $5,000 of this indebtedness on the note, paying the balance on April 15, 1954. It is for reimbursement for the total of such payments, in the sum of $13,416.55 plus interest from April 15, 1954, that the Knapps claim title to the disputed fund. The $5,500 note was satisfied from other sources. ■ The trial court correctly found and concluded that by consenting to the removal and sale of the crop the Knapps lost their mortgage lien thereon; that the Knapps had accepted the personal obligation of Hillhouse in the place and stead of the security of the mortgage, and that they were entitled to take nothing by their complaint in intervention. The Knapps' appeal is therefore without merit. They lost the security of their crop mortgage when Mr. Knapp consented to the harvesting, removal and sale of the crop by the mortgagor (Civ. Code, § 2972; *Horgan* v. *Zanetta*, 107 Cal. 27 [40 P. 22]). ■ Evidence of an equitable assignment must be clear and specific, the assignor must not retain any control over the fund or any authority to collect. (*Maier* v. *Freeman*, 112 Cal. 8, 13 [44 P. 357, 53 Am.St.Rep. 151].) ■ The evidence would not support a finding of an equitable assignment of the proceeds to the Knapps or that these proceeds were held in trust for them by the ginning company and as such were not subject to attachment.

The determination of the Southwest appeal depends upon the question of priority. There is no issue as to the validity of the Southwest attachment and its right to any moneys of Hillhouse held by the ginning company on February 18, 1954. ■ One of the issues in determining the priority of Iriart's claim is whether there was a segregation of his cotton at the ginning company's plant. The lease required that it be so segregated. The evidence supports a finding that there was a setting apart at the gin of an undivided one-quarter of the cotton ginned and baled and that the ginning company was instructed to sell and hold apart for Iriart his share of the proceeds. The fact that the ginning company kept its banking and ledger accounts in the manner shown does not detract from Iriart's right to these proceeds, pursuant to the segregation and his instructions. In its memorandum opinion the trial court stated that ''it is the finding of the Court that the landlord's share was set aside and that according to the instructions his share of the proceeds of the sale were to be held for him and distributed to him.'' This finding is not expressly incorporated in the formal findings of the court. However, it

impliedly appears in the specific finding that "plaintiff agreed with the said Hillhouse and with the Imperial Valley Ginning Company to waive his interest in the proceeds from the sale of said cotton. . . ."

The question of waiver is the next determinative issue. The court found that Iriart had waived his "interest in the proceeds from the sale of said cotton to the extent necessary to permit the said Gin to recover its loans and advances made to or for the account of the said Hillhouse for financing the said crop. *The Court finds that plaintiff did execute such a waiver and did thereby waive and relinquish his claim to twenty-five per cent (25%) of all proceeds from the sale of cotton applied by the said Gin to satisfy the obligations of the said Hillhouse due it. The Court finds that at any given time plaintiff's interest in proceeds from the sale of cotton in the hands of said Gin standing in the name of and in the account of the said Hillhouse did not exceed twenty-five per cent (25%) of the total thereof.* Nothing contained herein shall in any way affect the obligation of the said Hillhouse to pay to plaintiff . . . a sum equivalent to one-fourth of the total proceeds received from all cotton grown on the leased property." (Italics added.) It then found and concluded that on February 18, 1954, the ginning company held in its possession $3,853.12 as crop-share rent belonging to Iriart and $11,559.34 standing in the name of and belonging to Hillhouse, and entered judgment in these amounts.

█ We find no basis in the record for the portion of the findings above italicized. The lease evidences Iriart's agreement "to execute" a limited waiver for purposes of crop financing, and the agreement of the parties that the crop would be grown, harvested and ginned at the lessee's expense. There was evidence that Iriart consented to the ginning company's reimbursing itself before payment of any of the proceeds, but no further evidence of any waiver, oral or written. No problem is presented as to the rights of Iriart if the advances made by the ginning company had consumed the entire proceeds from the sale of the Hillhouse and Iriart cotton, for the reason that the gross proceeds were sufficient to completely reimburse the ginning company from Hillhouse's share. No authorization appears for the deduction from Iriart's share of any portion of these advances. The sum of $15,412.46 held by Imperial Valley Ginning Company on the date the attachment was levied represented net proceeds after the deduction of its own advances. Iriart was entitled to

one-fourth of the gross proceeds, and judgment in that amount should have been entered in his favor. Whatever balance remained in the fund represented money belonging to Hillhouse.

The judgment denying any relief to the Knapps is affirmed. The judgment otherwise is reversed and the same remanded to the trial court for the making of findings of fact, conclusions of law and the entry of judgment in accordance with the views herein expressed, each party to bear his own costs on appeal.

Gibson, C. J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.

CARTER, J.—I concur in the judgment but desire to state my views with respect to the rights of a crop mortgagee who permits the mortgagor to remove and dispose of the crop.

As the opinion now reads a crop mortgagee loses his security when he consents to the harvesting, removal and sale of the crop. I wish to point out that this statement is entirely too broad.

Where the mortgagor removes crops under the authorization of the mortgagee, in certain circumstances, the mortgagor will be deemed the agent of the mortgagee for the handling of the property after removal from the land. (See *Byrnes* v. *Hatch*, 77 Cal. 241, 244 [19 P. 482]; *Campodonico* v. *Oregon Improvement Co.*, 87 Cal. 566, 568 [25 P. 763].) To state it another way, the removal of the crop by the mortgagor is, in effect, a removal by the mortgagee, giving rise to a new possessory lien on behalf of the mortgagee. (See *Summerville* v. *Stockton Milling Co.*, 142 Cal. 529, 542-543 [76 P. 243]; *cf.*, *Valley Bank* v. *Hillside Packing Co.*, 91 Cal.App. 738, 741 [267 P. 746].)

However, the lien is only preserved where the authorization to remove the crop is given in the form of specific instructions. For example, directing the mortgagor to sell to a specific purchaser, or where appropriate, a warehouse receipt in the mortgagee's name is obtained. But when the instructions are general, such as a mere consent to remove the crop, the lien will be lost. (*I. S. Chapman & Co.* v. *Ulery*, 15 Cal. App.2d 452, 454-455 [59 P.2d 602]; *Haber* v. *J. G. Boswell Co.*, 130 Cal.App. 514, 517 [20 P.2d 100].) (For a detailed discussion of this problem see Smith, *Security Interest In Crops*, 10 Hastings L. J. 23, at 38-44.)

Applying these rules to the facts of the case at bar, it appears that the mortgagee lost his lien. Although the mortgagee, Knapp, directed the mortgagor to remove the crop, these directions were only in the form of a general consent, and not specific enough to establish a possessory lien. Moreover, there was no instruction to the warehouseman to hold the harvested crop in the mortgagee's name. Under these circumstances the lien was lost.

The petition of defendants and appellants for a rehearing was denied December 23, 1958.