Opinion
 

 MASTERSON, J.
 

 The producers of a motion picture entered into a written agreement with a distributor to exploit the picture domestically in the theatrical, television, and home video markets. The agreement contemplated that the distributor would enter into a separate contract with a subdistributor for home video release and obligated the distributor to require that the subdistributor pay 70 percent of the gross receipts directly to the producers.
 

 The distributor entered into a subdistribution contract but did not require the subdistributor to pay anything directly to the producers. Moreover, despite the provision in the producer-distributor agreement requiring that the producers receive 70 percent of the gross receipts, the distributor agreed to a 50/50 split of the net receipts between itself and the subdistributor. The subdistributor approved this arrangement without actual knowledge of the terms of the producer-distributor agreement.
 

 The producers filed this action against the distributor and the subdistributor, seeking to recover 70 percent of the gross receipts from the home video release of the picture. The producers and the subdistributor filed cross-motions for summary judgment. The trial court ruled in favor of the producers, concluding that the subdistributor was bound by the 70 percent gross receipts provision in the producer-distributor agreement, not by the 50 percent net receipts provision in its own contract. The subdistributor has appealed, arguing that its obligations are governed by its contract with the distributor, not by the producer-distributor agreement to which it was not a party. We agree and reverse.
 

 Background
 

 Plaintiffs Recorded Picture Company [Productions] Limited and Screen-frame Limited were the producers of the motion picture The Last Emperor. On May 12,1986, plaintiffs (the producers) entered into a written agreement granting Hemdale Film Corporation (Hemdale) all domestic distribution rights to the picture—theatrical, television, and home video—in perpetuity.
 
 [1]
 
 The parties further agreed that “upon delivery of the Picture to Hemdale, the
 
 *357
 
 worldwide copyright to the Picture (including all elements thereof) shall be owned by Hemdale or its designee.”
 

 According to the producers, “[i]t was contemplated by the parties . . . that, rather than actually distributing the Picture itself in certain media, Hemdale would appoint other distributors (‘subdistributors’) which would carry out the physical distribution of the Picture . . . .” To that end, the agreement provided that “Hemdale may distribute and market the Picture directly or cause it to be distributed through licensees or subdistributors .... Hemdale shall also have the sole and exclusive control of all terms and conditions of licensing and sublicensing the Picture, and all rights herein granted, including, but not limited to, outright sales or percentage agreements, the type and amount of rental or fee and the duration of the term.”
 

 In exchange for the grant of distribution rights, Hemdale agreed to pay the producers an advance of $8 million. With respect to the home video rights, the agreement provided that Hemdale could recoup its advance and that the producers and Hemdale would share in the home video proceeds as follows: “Hemdale shall retain the first Five Million Dollars ($5,000,000) of the amounts received from . . . [the] video company [i.e., subdistributor]. Hem-dale shall retain the excess over Five Million Dollars ($5,000,000) of such advance or guarantee until Hemdale has recouped the Eight Million Dollars ($8,000,000). . . (taking into account the Five Million Dollars ($5,000,000) retained as aforesaid) and the costs of prints and advertising paid or incurred by Hemdale and/or its assignees or licensees in connection with the picture .... Any additional Gross Receipts from Videogram Exploitation shall be divided Thirty Percent (30%) to Hemdale and Seventy Percent (70%) to Producer.” Under this provision, after Hemdale recouped its advance and other specified costs, the producers were entitled to 70 percent of
 
 all
 
 home video gross receipts, whether received by Hemdale or a subdistributor.
 
 (Recorded Picture Company
 
 [Productions]
 
 Ltd.
 
 v.
 
 Hemdale Film Corp.
 
 (Oct. 17, 1991) B055186 [nonpub. opn.].)
 

 However, in the words of the producers, “[they] did not trust Hemdale” because it was “a company that had the reputation of being difficult to collect from and of forcing those with whom it dealt to engage in costly and time consuming litigation to enforce their rights.” Accordingly, in an attempt to ensure that they received their share of the gross receipts, the producers
 
 *358
 
 provided in the agreement that “Hemdale shall instruct the applicable video-gram distributor to account directly to Producer for the amounts payable to Producer [i.e., 70 percent of the gross receipts]. . . .”
 
 [2]
 

 Hemdale began negotiations with defendant Nelson Entertainment, Inc. (Nelson), regarding the home video distribution of The Last Emperor. On August 17, 1987, Hemdale messengered documents to Nelson concerning the chain of title of The Last Emperor and requested that Nelson approve the chain of title. The producer-Hemdale agreement was not included among those documents. In a letter of response, Nelson stated: “We are not normally in the practice of issuing an ‘approval’ as you have requested. We basically rely upon the representations and warranties of our grantor, and upon those in the chain of title who have prepared, supplied or opined upon the rights documents supplied.” Despite Nelson’s requests for a copy of the producer-Hemdale agreement, Hemdale did not provide one.
 

 On or about August 20, 1987, Nelson executed a written contract with Hemdale (dated as of May 29, 1987) granting Nelson the exclusive right to distribute The Last Emperor in the domestic home video market for seven years. Hemdale retained the copyright in the picture. Hemdale expressly “representfed] and warranted] that [it] ha[d] the sole and exclusive right and authority to make the grant of rights to [Nelson].” In exchange for the home video rights, Nelson agreed to pay Hemdale an advance of $6.5 million, to be paid in several installments. The proceeds from the home video distribution were to be divided between Nelson and Hemdale as follows: (1) Nelson would retain 30 percent of the gross receipts as its distribution fee; (2) Nelson would retain an amount equal to certain of its distribution expenses (with a ceiling of 20 percent of gross receipts); and (3) after Nelson recouped its $6.5 million advance plus interest, Nelson and Hemdale would share equally in any net receipts. The contract required Nelson to pay 50 percent of the net receipts directly to Hemdale. There was no provision in the contract requiring that Nelson pay any amount directly to the producers.
 
 *359
 
 At the time it entered into the contract with Hemdale, Nelson did not have actual knowledge of the terms of the producer-Hemdale agreement.
 

 On June 9, 1988, the producers sent Nelson a letter, stating in part: “[U nder Hemdale’s agreement with the [producers], after Hemdale recoups its advance to the [producers], the [producers are] entitled, with certain limited exceptions, to 70% of the gross receipts of distributors and subdistributors in the home video field, and such distributors and subdistributors are to account directly to the [producers] for [the producers’] share of the gross. The failure to include such provisions in your agreement with Hem-dale was a material breach of the [producer-Hemdale] Agreement.” Upon receipt of this letter, Nelson learned for the first time about the division of proceeds required by the producer-Hemdale agreement (with the producers to receive 70 percent of gross receipts) and that its contract with Hemdale (under which Nelson and Hemdale would share net receipts equally) might be in conflict with the producer-Hemdale agreement. By letter of June 21, 1988, Nelson again requested that Hemdale provide it with a copy of the producer-Hemdale agreement. As of mid-August, Nelson still had not received a copy of that agreement.
 
 [3]
 

 In late August 1988, the producers filed this action against Hemdale and Nelson, among others. In April 1992, the producers filed a second amended complaint, which was the operative pleading at the time of the summary judgment proceedings below. The second amended complaint alleged causes of action against Hemdale for breach of contract and declaratory relief. Against Nelson, the producers alleged causes of action for conversion, imposition of trust, breach of fiduciary duty, breach of agency duties, inducing breach of contract, and declaratory relief. In essence, the amended complaint alleged that Hemdale and Nelson owed the producers 70 percent of the home video gross receipts (in accordance with the producer-Hemdale agreement) despite Nelson’s entitlement to 50 percent of the net receipts under the Hemdale-Nelson contract.
 

 In July 1992, Nelson filed a cross-complaint against Hemdale, alleging claims for breach of contract and indemnity. In addition to damages for breach of contract, Nelson sought to be indemnified in the event it was found liable to the producers.
 

 At some point during the litigation, Hemdale filed for bankruptcy. As a result, the producers’ attempt to hold Nelson liable for the payments due under the producer-Hemdale agreement took on added significance.
 

 
 *360
 
 In July 1994, Nelson filed a motion for summary judgment on the producers’ complaint, arguing that it had no duty to pay them in accordance with the producer-Hemdale agreement. The producers filed a cross-motion for summary judgment. After full briefing and oral argument, the trial court denied Nelson’s motion and granted the producers’ motion. The trial court reasoned that when Nelson entered into the contract with Hemdale, it either knew or should have known about the terms of the producer-Hemdale agreement. That knowledge, according to the trial court, made Nelson liable to the producers for 70 percent of the home video gross receipts under Civil Code section 1589, which provides: “A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting.”
 

 Based on gross receipts received through March 31, 1994, the trial court entered judgment against Nelson for the principal sum of $6,507,960.90 plus interest in the amount of $283,497. The trial court further ordered that Nelson pay the producers 70 percent of all video gross receipts generated from and after April 1, 1994.
 
 [4]
 
 Nelson filed a timely appeal from the judgment.
 

 Discussion
 

 Summary judgment is appropriate if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)
 

 A.
 
 The Producers’ Motion for Summary Judgment
 

 A cause of action is deemed to have merit unless (1) one or more of the elements of the cause of action cannot be separately established or (2) a defendant establishes an affirmative defense to that cause of action. (Code Civ. Proc., § 437c, subd. (n).) A plaintiff seeking summary judgment meets its burden of showing that there is no defense to a cause of action by proving each element of the cause of action entitling it to judgment on that claim.
 
 *361
 

 (Id.,
 
 § 437c, subd. (o)(l).) Once the plaintiff has met that burden, the burden shifts to the defendant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.
 
 (Ibid.)
 

 “In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. ... In making this determination, the moving party’s affidavits are strictly construed while those of the opposing party are liberally construed.”
 
 (Hanooka
 
 v.
 
 Pivko
 
 (1994) 22 Cal.App.4th 1553, 1558 [28 Cal.Rptr.2d 70], citations omitted.) We accept as undisputed facts only those portions of the moving party’s evidence that are not contradicted by the opposing party’s evidence.
 
 (Kelleher
 
 v.
 
 Empresa Hondurena de Vapores, S.A.
 
 (1976) 57 Cal.App.3d 52, 56 [129 Cal.Rptr. 32].) In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true. (See
 
 Zeilman
 
 v.
 
 County of Kern
 
 (1985) 168 Cal.App.3d 1174, 1179, fn. 3 [214 Cal.Rptr. 746].) Finally, “‘[w]e are not bound by the trial court’s stated reasons, if any, supporting its ruling; we review the ruling, not its rationale.’ ”
 
 (Mancuso
 
 v.
 
 Southern Cal. Edison Co.
 
 (1991) 232 Cal.App.3d 88, 95 [283 Cal.Rptr. 300].)
 

 In moving for summary judgment, the producers argued that Nelson was bound by the 70/30 gross receipts provision in the producer-Hemdale agreement on five alternative grounds: (1) Civil Code section 1589,
 
 [5]
 
 (2) Nelson’s constructive knowledge of the terms of the producer-Hemdale agreement, (3) the doctrine of equitable assignments, (4) Nelson’s relationship to the producers as a fiduciary, and (5) Nelson’s failure to review the producer-Hemdale agreement before entering into a contract with Hemdale. The trial court relied on only the first of these theories in ruling for the producers, finding that Nelson had to pay the producers in accordance with the producer-Hemdale agreement because it had accepted the benefits of that agreement. We conclude that the trial court erred in that respect. We further conclude that none of the producers’ alternative arguments are sufficient to support summary judgment. We therefore reverse the granting of the producers’ motion.
 

 1.
 
 Civil Code Section 1589
 

 We acknowledge the wisdom of the maxim that one who accepts the benefit of a contract or transaction is also obligated to accept the burdens
 
 *362
 
 thereof, but find that the maxim has no application to this case. Nelson accepted the benefit of its contract with Hemdale, and it must therefore accept the burdens of
 
 that
 
 contract. Since Nelson did not receive the benefit of the producer-Hemdale agreement, it is not bound by the obligations imposed by that agreement.
 

 “The general rule is that the mere assignment of rights under an executory contract does not cast upon the assignee the obligations imposed by the contract upon the assignor. . . . The rule is otherwise, however, where the assignee assumes such obligations. . . . ‘[W]hether there has been an assumption of the obligations is to be determined by the intent of the parties as indicated by their acts, the subject matter of the contract or their words.’ . . . Assumption of obligations may be implied from acceptance of benefits under the contract. (Civ. Code, § 1589 . . . .)’’
 
 (Enterprise Leasing Corp.
 
 v.
 
 Shugart Corp.
 
 (1991) 231 Cal.App.3d 737, 745 [282 Cal.Rptr. 620], citations omitted.)
 

 Civil Code section 1589 “has generally been held to apply only where the person accepting the benefit was a party to the original transaction.”
 
 (Fruitvale Canning Co.
 
 v.
 
 Cotton
 
 (1953) 115 Cal.App.2d 622, 626 [252 P.2d 953], overruled on other grounds in
 
 Lucas
 
 v.
 
 Hamm
 
 (1961) 56 Cal.2d 583, 590-591 [15 Cal.Rptr. 821, 364 P.2d 685].) However, under a well established exception to the general rule, section 1589 “requires the
 
 assignee
 
 of an executory contract to accept the burdens when
 
 all
 
 the benefits of a full performance have inured to him.”
 
 (Fruitvale, supra,
 
 115 Cal.App.2d at p. 626, italics added; accord,
 
 Wilson
 
 v.
 
 Beazley
 
 (1921) 186 Cal. 437, 444 [199 P. 772];
 
 Cutting Pack. Co.
 
 v.
 
 Packers’ Exch.
 
 (1890) 86 Cal. 574, 577 [25 P. 52].) “ ‘ . . [W]here after the assignment is made, the executory provisions of the contract are fully performed,
 
 the benefit inuring solely to the assignee,
 
 and where by his actions he holds himself out as personally liable and recognizes the original contract as binding upon him, he is liable to the other party equally with the assignor.’”
 
 (Fruitvale, supra,
 
 115 Cal.App.2d at p. 626, italics added in
 
 Fruitvale;
 
 accord,
 
 Fanning
 
 v.
 
 Yoland Productions, Inc.
 
 (1957) 150 Cal.App.2d 444, 448-450 [310 P.2d 85].)
 
 [6]
 

 Here, Nelson was not an assignee of the producer-Hemdale agreement, nor did it accept or receive all of the benefits of that agreement. The
 
 *363
 
 producers transferred to Hemdale all domestic distribution rights in The Last Emperor—theatrical, television, and home video—in perpetuity. The producers also assigned the copyright in the picture to Hemdale. In contrast, the Hemdale-Nelson contract authorized Nelson to distribute the picture in the home video market only; Nelson did not receive the distribution rights for theatrical or television release. Further, Nelson’s distribution rights terminated after seven years (and reverted to Hemdale), while Hemdale received the distribution rights in perpetuity. Moreover, Hemdale retained the copyright in the picture. Under these circumstances, Nelson was a licensee, not an assignee. “A transfer of anything less than a totality of a work is a license and not an assignment.”
 
 (Intern. Film Exchange, Ltd.
 
 v.
 
 Corinth Films, Inc.
 
 (S.D.N.Y. 1985) 621 F.Supp. 631, 635; accord,
 
 Key Maps, Inc.
 
 v.
 
 Pruitt
 
 (S.D.Tex. 1978) 470 F.Supp. 33, 38-39; Webster’s Third New Internat. Dict. (1993) p. 1304, col. 2 [defining “license” as “the grant of some but not all of the rights embraced in a copyright”].)
 

 We decline to adopt the rule proposed by the producers—that a company must comply with a contract to which it is not a party if it has accepted even a portion of the benefits of that contract through a subsequent, separate agreement with one of the original contracting parties. Such a rule would lead to absurd consequences. For instance, if Nelson had entered into an additional agreement with a different distributor for each state, then those 50 distributors (or, more accurately, sub-subdistributors) would be separately liable to the producers for the full 70 percent of gross receipts from home video release although each one would have received only a small fraction of that sum. We reject this illogical and unjust result. (See
 
 Stone
 
 v.
 
 Owens
 
 (1894) 105 Cal. 292, 297-298 [38 P. 726] [creditors who are paid by contractor from proceeds received for work done under construction contract
 
 *364
 
 have not received a “benefit” of that contract within the meaning of Civil Code section 1589; to hold otherwise would give section 1589 “an outrageously unjust[] effect”].)
 

 We also find unpersuasive the producers’ analogy to the landlord-tenant context. The producers contend that Nelson is liable to them in the same way that a sublessee would be liable to a landlord under the main lease (i.e., the agreement between the landlord and the lessee/sublessor). To the contrary, unless a sublessee has assumed the lessee’s contractual obligations, it “is not liable to the original lessor in damages for breach of covenants in the parent lease. ... A sublessee is liable only to his own lessor, that is, the sublessor, since he does not acquire the whole estate, but only a portion of the unexpired term.”
 
 (Hartman Ranch Co.
 
 v.
 
 Associated Oil Co.
 
 (1937) 10 Cal.2d 232, 242 [73 P.2d 1163]; see
 
 id.
 
 at pp. 242-246; accord, 6 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 18:60, p. 125 [“the subtenant is not liable to his landlord for the tenant’s covenants contained in the master lease”]; 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 639, p. 825 [because “[t]he sublessee is normally neither in privity of contract nor privity of estate with the lessor, ... the lessor has no action against him for rent”]; cf.
 
 Samuels
 
 v.
 
 Singer
 
 (1934) 1 Cal.App.2d 545, 554 [36 P.2d 1098] [“the
 
 wrongful
 
 occupant of real property [is obligated] to pay to the owner thereof the
 
 reasonable value of
 
 the use thereof during the period of such occupancy” (italics added)].)
 
 [7]
 

 In language appropriate to the producers’ landlord-tenant analogy, one Court of Appeal has stated: “As between [the landlord] and . . . [the] sublessees there was neither privity of estate nor privity of contract. . . . [The landlord], therefore, could not sue the undertenants upon the original lessee’s covenant to pay the rent, unless the undertenants had assumed the lease, nor could an action be maintained for the use and occupation of the premises, unless there had been an agreement for the use of the premises express or implied between the lessor and the sublessee. . . . When, however, the original lessee becomes insolvent, equity will compel the subtenant to make all future payments of rent to the lessor
 
 according to the terms of the
 
 
 *365
 

 sublease
 
 . . . .”
 
 (City Investment Co.
 
 v.
 
 Pringle
 
 (1925) 73 Cal.App. 782, 788 [239 P. 302], citations omitted, italics added.) Under this reasoning, the producers might be able to maintain a claim against Nelson if Hemdale is insolvent, but, even in that event, the producers would be limited to enforcing
 
 Nelson’s
 
 obligations under the
 
 Hemdale-Nelson contract.
 
 Here, the producers are improperly seeking to hold Nelson responsible for
 
 Hemdale’s
 
 duties under the
 
 producer-Hemdale agreement.
 

 In sum, since Nelson did not “accept the benefit” of the producer-Hemdale agreement, it is not subject to the burdens of that agreement under Civil Code section 1589.
 

 2.
 
 Nelson’s Knowledge of the Terms of the Producer-Hemdale Agreement
 

 The producers contend that Nelson had constructive knowledge of the content of the producer-Hemdale agreement when it entered into the subdistribution contract with Hemdale. Such knowledge, the producers argue, precludes Nelson from relying on the 50/50 net receipts provision of its contract with Hemdale and requires it to honor the 70/30 gross receipts provision in the producer-Hemdale agreement. We find this contention without merit inasmuch as Nelson did not have constructive knowledge of the payment provisions in the producer-Hemdale agreement.
 

 While Nelson may have had actual knowledge of the
 
 existence
 
 of the producer-Hemdale agreement when it entered into the subdistribution contract, it did not have actual knowledge of the pertinent
 
 terms
 
 of the producer-Hemdale agreement (i.e., the provisions entitling the producers to direct payment of 70 percent of the gross receipts). Given this lack of actual knowledge, the producers argue that Nelson had constructive knowledge of the terms of the producer-Hemdale agreement because Hemdale had recorded a UCC-1 financing statement with the California Secretary of State and a copyright mortgage with the United States Copyright Office. (See fn. 2,
 
 ante.)
 

 [8]
 

 No doubt, the recording of the UCC-1 and the copyright mortgage in 1986 put Nelson on constructive notice of the information contained in
 
 those
 
 
 *366
 
 documents. (See
 
 T & O Mobile Homes, Inc.
 
 v.
 
 United California Bank
 
 (1985) 40 Cal.3d 441, 446-448 [220 Cal.Rptr. 627, 709 P.2d 430] [discussing effect of recordation of UCC-1 form]; 17 U.S.C. § 205(c) [“Recordation of a document in the Copyright Office gives all persons constructive notice of the facts stated in the recorded document . . . .”].) Both the UCC-1 and the copyright mortgage referenced the existence of the producer-Hemdale agreement. In addition, the UCC-1 indicated that, with respect to The Last Emperor, Hemdale had a security interest in, among other things, “[a] 11 rights, title and interest in and to all goods, chattels, property, equipment, accounts, contract rights and general intangibles heretofore or hereafter created in connection with the production of or any dealings in the Picture.” The copyright mortgage stated that the producers “do[] hereby mortgage and assign to Hemdale and its successors and assigns . . . [a]ll rights, title and interest in and to the Picture . . . and all copyrights, right of copyright and renewal and extension of copyright.”
 

 However, neither the UCC-1 nor the copyright mortgage described the payment terms of the producer-Hemdale agreement. Consequently, the producers contend that a recorded document provides constructive knowledge not only of its own content but also of the content of any other document referenced therein. We reject this contention. Absent suspicious or other circumstances warranting a reasonable investigation, a recorded document does not put a potential purchaser on notice of the content of a referenced, unrecorded document. (See
 
 American Medical International, Inc.
 
 v.
 
 Feller
 
 (1976) 59 Cal.App.3d 1008, 1020 [131 Cal.Rptr. 270];
 
 Gates Rubber Co.
 
 v.
 
 Ulman
 
 (1989) 214 Cal.App.3d 356, 365 [262 Cal.Rptr. 630] [applying
 
 American Medical
 
 International];
 
 Pacific Trust Co. TTEE
 
 v.
 
 Fidelity Fed. Sav. & Loan Assn.
 
 (1986) 184 Cal.App.3d 817, 820-821, 825 [229 Cal.Rptr. 269] [junior lienholder had constructive notice of senior lienholder’s prior recorded deed of trust and was on inquiry notice as to terms of promissory note, which was referenced in deed]; Civ. Code, § 19 [“Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact.”]; see also
 
 Roberts
 
 v.
 
 Fitzallen
 
 (1898) 120 Cal. 482, 483-484 [52 P. 818] [in foreclosure action against grantee who assumed mortgage, attorney fee provision contained in note was not binding on grantee since provision did not appear in recorded mortgage].)
 

 When Nelson entered into the subdistribution contract with Hemdale, it had no reason to believe that the terms of that contract were inconsistent with any provisions in the producer-Hemdale agreement. Indeed, to the
 
 *367
 
 extent Nelson had knowledge (constructive or actual) of Hemdale’s rights through the UCC-1 or the copyright mortgage, it appeared that Hemdale had full authority to enter into a subdistribution contract calling for an equal share of net receipts between the two parties to that contract. Moreover, Hemdale expressly warranted in the subdistribution contract that it had the exclusive authority to grant the home video rights to Nelson. In short, at the time the subdistribution contract was executed, nothing would have raised Nelson’s suspicions about whether Hemdale was acting in conformity with the producer-Hemdale agreement.
 
 [9]
 
 Accordingly, Nelson was not on “inquiry notice” as to the terms of the producer-Hemdale agreement—which were not described in the recorded documents—and Nelson was not deemed to have had constructive knowledge of the content of the producer-Hemdale agreement.
 

 Finally, we are unwilling to hold that, regardless of the circumstances, a subdistributor is always charged with knowledge of the terms of the main distribution agreement. We recognize that somewhat similar rules have been adopted with regard to the transfer of real property. By way of example, “ ‘[i]t is the duty of a person contracting for a sublease to ascertain the provisions of the original lease; and a subtenant is charged with notice of the existence of the original lease, and is bound by its terms and conditions.’ ”
 
 (Pedro
 
 v.
 
 Potter
 
 (1926) 197 Cal. 751, 760 [242 P. 926, 42 A.L.R 1165].) Of course, this particular rule furthers the important common law principle favoring the free alienability of real property by allowing the landlord to retake possession of the leased premises regardless of who—the tenant or the subtenant—has violated the terms of the main lease. (See
 
 Carma Developers (Cal.), Inc.
 
 v.
 
 Marathon Development California, Inc.
 
 (1992) 2 Cal.4th 342, 354-355, 358 [6 Cal.Rptr.2d 467, 826 P.2d 710];
 
 Kendall
 
 v.
 
 Ernest Pestaña, Inc., supra,
 
 40 Cal.3d at p. 494; 6 Miller & Starr, Cal. Real Estate,
 
 op. cit. supra,
 
 § 18:60, p. 126; see also Civ. Code, §711 [codifying common law principle against restraints on alienation].) However, no such principle applies to the nonreal property at issue here. Moreover, while a landlord can take possession from the subtenant for violating the terms of the main lease, the subtenant cannot be held liable to the landlord for amounts due under that lease. (See pt. A.l,
 
 ante.)
 
 Accordingly, in this case, since the producers seek to hold Nelson liable under the main (producer-Hemdale) agreement, analogies to real property law do not support their requested relief. (Cf.
 
 Enterprise Leasing Corp.
 
 v.
 
 Shugart Corp., supra,
 
 231 Cal.App.3d at pp. 745-746 [declining to apply real property law in determining assignee’s obligations under a lease of personal property].)
 

 
 *368
 
 3.
 
 Equitable Assignment
 

 The producers contend that their right to 70 percent of the gross receipts under the producer-Hemdale agreement was binding on Nelson under the doctrine of equitable assignments. We disagree.
 

 “Evidence of an equitable assignment must be clear and specific, [and] the assignor must not retain any control over the fund or any authority to collect.” (Iriart v.
 
 Southwest Fertilizer etc. Co.
 
 (1958) 51 Cal.2d 270, 275 [332 P.2d 285].) It has also been said that an equitable assignment “is implied from the conduct of the parties rather than established by express words of formal assignment.”
 
 (First Nat. Bank
 
 v.
 
 Pomona Tile Mfg. Co.
 
 (1947) 82 Cal.App.2d 592, 606 [186 P.2d 693].) The doctrine of equitable assignments is typically used to enforce an attempted assignment of rights that is technically defective or to create a right of subrogation. (See, e.g.,
 
 Kelly
 
 v.
 
 Kelly
 
 (1938) 11 Cal.2d 356, 364 [79 P.2d 1059, 119 A.L.R. 71] [“ ‘equity will uphold assignments[] not valid at law’ ”];
 
 Fidelity National Title Ins. Co.
 
 v.
 
 Miller
 
 (1989) 215 Cal.App.3d 1163, 1174 [264 Cal.Rptr. 17] [“ ‘[E]quitable assignment or right of subrogation is a creature of equity and applies to all cases where one party involuntarily pays a debt for which another is primarily liable and which in equity and good conscience should have been paid by the latter. . . .’”].)
 

 Nevertheless, an “equitable assignment” is still an “assignment.” “To ‘assign’ ordinarily means to transfer title or ownership of property . . . , but an assignment, to be effective, must include manifestation to another person by the owner of his intention to transfer the right, without further action, to such other person or to a third person. . . . It is the substance and not the form of a transaction which determines whether an assignment was intended. .. . If from the entire transaction and the conduct of the parties it clearly appears that the intent of the parties was to pass title to the [property], then an assignment will be held to have taken place.”
 
 (McCown
 
 v.
 
 Spencer
 
 (1970) 8 Cal.App.3d 216, 225 [87 Cal.Rptr. 213], citations omitted.)
 

 As we have already held, Nelson received a
 
 license
 
 of certain rights granted Hemdale under the producer-Hemdale agreement; Nelson did not receive an assignment. (See pt. A.1.,
 
 ante.)
 
 Moreover, the producers cite no evidence suggesting that they intended Nelson to take title to, or ownership of, the rights granted Hemdale. If anything, just the opposite is true; the producer-Hemdale agreement stated that “[n]either party shall have the right to assign its rights or obligations hereunder without the written consent of the other.” No such consent was given. Further, the producers and Hemdale
 
 *369
 
 provided that “[t]his Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any such third party.”
 

 In light of this evidence, we conclude that the doctrine of equitable assignments did not require Nelson to pay the producers 70 percent of the gross receipts.
 

 4.
 
 Nelson’s Alleged Role as a Fiduciary
 

 The producers argue that Nelson’s relationship to them was fiduciary in nature since Nelson was a trustee or agent with regard to the distribution proceeds. As a fiduciary, so the argument goes, Nelson had a duty to ignore the 50/50 net receipts provision in its own contract and instead comply with the 70/30 gross receipts provision in the producer-Hemdale agreement. We reject this contention for several reasons.
 

 First, the producers rely on the Hemdale-Nelson contract—Nelson’s only connection to The Last Emperor—in arguing that Nelson owed them the duties of a fiduciary. Having invoked the “fiduciary” mantle, the producers then assert that Nelson was obligated to pay them in accordance with the producer-Hemdale agreement. In other words, as the producers see it, the Hemdale-Nelson contract gave rise to a fiduciary duty requiring Nelson to disregard the payment terms of that very contract. This is a non sequitur. We think it clear that the Hemdale-Nelson contract did not contain such a self-destruct mechanism: a contract cannot be the source of a duty (fiduciary or otherwise) to breach that contract.
 

 Second, assuming arguendo that Nelson’s
 
 indirect
 
 relationship with the producers was fiduciary in nature, we think Nelson would also be a fiduciary as to Hemdale, with whom it had a
 
 direct
 
 relationship. If that were the case, we fail to understand how Nelson’s role as a fiduciary would require it to comply with the payment provisions in the producer-Hemdale agreement. After all, Nelson was not a party to that agreement and did not know about the 70/30 gross receipts provision when it entered into the Hemdale-Nelson contract. If anything, Nelson’s role as a fiduciary would obligate it to satisfy the express terms—the 50/50 net receipts provision—of its own contract with Hemdale. Simply put, Nelson’s alleged fiduciary duty did not require it to simultaneously comply with conflicting, irreconcilable payment terms. The provisions of the Hemdale-Nelson contract would govern Nelson’s obligations.
 

 Finally, we conclude that there was no fiduciary relationship between Nelson and the producers. Unquestionably, an agent undertakes fiduciary
 
 *370
 
 obligations with respect to his principal, as does a trustee with respect to the beneficiaries of a trust. (See
 
 Michelson
 
 v.
 
 Hamada
 
 (1994) 29 Cal.App.4th 1566, 1579-1580 [36 Cal.Rptr.2d 343] [agent];
 
 Lasky, Haas, Cohler & Munter
 
 v.
 
 Superior Court
 
 (1985) 172 Cal.App.3d 264, 280 [218 Cal.Rptr. 205] [trustee].) However, in this case, no fiduciary obligations existed between the producers and Nelson.
 

 “A
 
 ‘confidential relation’ in law may be defined to be any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter’s knowledge or consent. A ‘fiduciary relation’ in law is ordinarily synonymous with a ‘confidential relation.’ ”
 
 (Bacon
 
 v.
 
 Soule
 
 (1912) 19 Cal.App. 428, 434 [126 P. 384].) As stated more recently, “[a] fiduciary relationship is created where a person reposes trust and confidence in another and the person in whom such confidence is reposed obtains control over the other person’s affairs.”
 
 (Lynch
 
 v.
 
 Cruttenden & Co.
 
 (1993) 18 Cal.App.4th 802, 809 [22 Cal.Rptr.2d 636].)
 

 Under these principles, the typical distribution contract, negotiated at arm’s length, does not create a fiduciary relationship between the owner of a product and the distributor.
 
 (Rickel
 
 v.
 
 Schwinn Bicycle Co.
 
 (1983) 144 Cal.App.3d 648, 653-655 [192 Cal.Rptr. 732];
 
 Anthony Distributors, Inc.
 
 v.
 
 Miller Brewing Co.
 
 (M.D.Fla. 1995) 162 F.R.D. 169, 171;
 
 OKI Distributing, Inc.
 
 v.
 
 Amana Refrigeration, Inc.
 
 (S.D.Ohio 1994) 850 F.Supp. 637, 647; see also
 
 Gonsalves
 
 v.
 
 Hodgson
 
 (1951) 38 Cal.2d 91, 98-99 [237 P.2d 656] [no fiduciary relationship where parties engaged in course of arm’s-length dealing].)
 

 In
 
 Waverly Productions, Inc.
 
 v.
 
 RKO General, Inc.
 
 (1963) 217 Cal.App.2d 721 [32 Cal.Rptr. 73], the Court of Appeal rejected the argument that a fiduciary relationship existed between a film producer and a distributor, stating: “The [distribution] contract is an elaborate one which undertakes to define the respective rights and duties of the parties .... A mere contract or a debt does not constitute a trust or create a fiduciary relationship.”
 
 (Id.
 
 at pp. 731-732; see
 
 id.
 
 at pp. 732-734 [discussing cases].) Obviously, if a
 
 *371
 
 fiduciary relationship does not exist between a producer and a distributor, then no such relationship exists between a producer and a subdistributor.
 
 [10]
 

 5.
 
 Nelson’s Failure to Review the Producer-Hemdale Agreement
 

 Although Nelson requested that Hemdale provide it with a copy of the producer-Hemdale agreement, it did not receive one until after entering into the subdistribution contract. Nelson admits that it was putting itself “at risk” by not adequately verifying the chain of title as to the rights it was purchasing from Hemdale. Nelson also knew that the producer-Hemdale agreement might be critical in determining the integrity of the chain of title, depending upon its content. Nevertheless, Nelson went forward with the subdistribution contract without having obtained and reviewed Hemdale’s agreement with the producers.
 

 Had Nelson reviewed the producer-Hemdale agreement before entering into the subdistribution contract, it would have discovered the 70/30 gross receipts provision and could have insisted on changes in its own contract or could have refused to enter into any contract with Hemdale. Based on this scenario, the producers contend that Nelson is in the same position as a person who buys a car from a thief without adequately verifying title. Plainly, “a thief cannot transfer valid title.”
 
 (Naftzger
 
 v.
 
 American Numismatic Society
 
 (1996) 42 Cal.App.4th 421, 428 [49 Cal.Rptr.2d 784].) We find the producers’ analogy unconvincing.
 

 Unlike a car thief, who has no ownership interest in the item he sells, Hemdale owned the domestic home video rights to The Last Emperor. It conveyed those rights to Nelson for a seven-year period. In doing so, Hemdale simply failed to structure the subdistribution contract in accordance with the payment terms of its agreement with the producers. Consequently, this is not a case where the purchaser (Nelson) acquired something that the seller (Hemdale) did not own. The correct way to view it is that Hemdale sold something at the wrong price.
 

 We have previously recognized that “[a]n owner who entrusts his property to another bears some responsibility for creating a situation whereby an
 
 *372
 
 innocent purchaser is led to buy goods from an agent who is acting in excess of his authority. The law sometimes protects the innocent purchaser’s title against the defrauded owner, depending upon the circumstances.”
 
 (.Naftzger
 
 v.
 
 American Numismatic Society, supra,
 
 42 Cal.App.4th at pp. 429-430, italics omitted.) “Where one of two innocent parties must suffer because of the fraud of a third, the loss must be borne by the person whose negligence or misplaced confidence made the injury possible.”
 
 (Miller
 
 v.
 
 Wood
 
 (1963) 222 Cal.App.2d 206, 209 [35 Cal.Rptr. 49]; accord,
 
 Correa
 
 v.
 
 Quality Motor Co.
 
 (1953) 118 Cal.App.2d 246, 252-253 [257 P.2d 738];
 
 Carter
 
 v.
 
 Rowley
 
 (1922) 59 Cal.App. 486, 489 [211 P. 267]; Civ. Code, § 3543.)
 

 Before executing their agreement with Hemdale, the producers contemplated that Hemdale would use a subdistributor to release The Last Emperor in the home video market. Because the producers did not trust Hemdale with the home video proceeds, they attempted to protect their interest by requiring Hemdale to instruct the subdistributor to pay 70 percent of the gross receipts directly to them. That attempt failed because Hemdale did not so instruct Nelson and instead agreed to a 50/50 split of net receipts, with no provision that any amount be paid to the producers, directly or indirectly.
 

 In contrast to the producers’ actual distrust of Hemdale, Nelson had no reason to believe that, in negotiating the subdistribution contract, Hemdale would disregard the terms of its agreement with the producers. Significantly, the UCC-1 and the copyright mortgage, both of which were executed by the producers, indicated to Nelson that Hemdale owned all rights, title, and interest in The Last Emperor, including all contract rights. Those documents did not suggest any limitations on Hemdale’s ability to structure payment terms with a subdistributor. Consistent with the content of the UCC-1 and the copyright mortgage, Hemdale represented to Nelson that it had full authority to enter into what became the Hemdale-Nelson contract. Nelson reasonably relied on that representation.
 

 Given this evidence, we conclude that, as between the producers and Nelson, the producers must incur any harm or loss occasioned by Hemdale’s failure to comply with the producer-Hemdale agreement. The producers chose Hemdale as the main distributor of The Last Emperor despite serious doubts about Hemdale’s integrity and with full knowledge of Hemdale’s alleged reputation as a litigious company that withholds payment from creditors. Nelson, on the other hand, had no basis to suspect Hemdale of possible wrongdoing. Moreover, in light of their distrust of Hemdale, the producers could have taken a variety of actions not only to protect their own
 
 *373
 
 interest in the home video release of the picture but also to shield potential subdistributors from the type of litigation that Nelson has had to face.
 
 [11]
 

 Our conclusion does not ignore the fact that Nelson knowingly took a “risk" by failing to obtain and review the producer-Hemdale agreement before entering into the subdistribution contract. Nelson readily concedes that there were risks associated with its conduct. For example, if Hemdale had not acquired the home video rights to The Last Emperor, Nelson’s failure to review the producer-Hemdale agreement (which would have disclosed this hypothetical lack of ownership) would have brought this case within the producers’ car thief analogy; Nelson would have paid for something that Hemdale did not own.
 
 [12]
 
 However, based on the situation that actually existed, we conclude that Nelson’s willingness to take some form of “risk” did not require that it fill Hemdale’s shoes under the producerHemdale agreement.
 
 [13]
 

 In sum, neither Civil Code section 1589, Nelson’s knowledge of the existence of the producer-Hemdale agreement, the doctrine of equitable assignments, an alleged fiduciary relationship between the producers and Nelson, nor Nelson’s failure to review the producer-Hemdale agreement before entering into the subdistribution contract entitled the producers to summary judgment.
 

 B.
 
 Nelson’s Motion for Summary Judgment
 

 “A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more
 
 *374
 
 elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . Once the defendant’s burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action.”
 
 (Hanooka
 
 v.
 
 Pivko, supra,
 
 22 Cal.App.4th at p. 1558, citations omitted; see also Code Civ. Proc., § 437c, subd. (o)(2).)
 

 Having rejected the grounds which would support summary judgment for the producers, the question remains as to whether Nelson is entitled to summary judgment. Not surprisingly, the contentions raised by Nelson’s motion for summary judgment were identical to those raised in the producers’ cross-motion. We have already resolved all of those contentions in Nelson’s favor. It follows that, as a matter of law, the producers’ claims against Nelson are without merit.
 
 [14]
 
 Accordingly, the trial court should have granted summary judgment for Nelson.
 

 Disposition
 

 The judgment is reversed. On remand, the trial court shall vacate its order denying defendant Nelson Entertainment, Inc.’s motion for summary judgment, shall enter a new order granting that motion, and shall enter judgment in favor of Nelson and against the plaintiffs. Nelson is entitled to recover its costs on appeal.
 

 Spencer, P. J., and Ortega, J., concurred.
 

 A petition for a rehearing was denied April 3, 1997, and the opinion was modified to read as printed above. Respondents’ petition for review by the Supreme Court was denied June 11, 1997.
 

 [1]
 

 By “domestic” rights, we refer to the agreement’s “territory,” which was defined as “[t]he United States and Canada and their respective territories and possessions, and all ships and
 
 *357
 
 airplanes of the registry, nationality or flag of the United States or Canada (regardless of location), and the Red Cross and other civilian installations and military establishments operated by any of the armed forces of the United States or Canada (regardless of location).”
 

 [2]
 

 In connection with the agreement, Hemdale filed a UCC-1 financing statement with the California Secretary of State and the New York Department of State in June 1986. That document referenced the existence of the producer-Hemdale agreement (but did not describe all of its terms) and indicated that Hemdale had a security interest in The Last Emperor. The UCC-1 listed the producers as debtors and Hemdale as the secured party. Similarly, in August 1986, Hemdale filed a “mortgage and assignment of copyright” with the United States Copyright Office. The copyright mortgage referenced the existence of the producer-Hemdale agreement (without describing all of its terms) and indicated that the producers had assigned the copyright in The Last Emperor to Hemdale. Both the UCC-1 and the copyright mortgage were signed by representatives of the producers. Neither document mentioned anything about how or what the producers were to be paid for the distribution rights granted Hemdale.
 

 [3]
 

 On June 13, 1988, the producers had sent Nelson a portion of their agreement with Hemdale, which included the provision requiring that any home video subdistributor pay 70 percent of the gross receipts directly to the producers.
 

 [4]
 

 As of March 31, 1994, gross receipts were $14,297,087. Under the Hemdale-Nelson contract, Nelson would have recovered (out of gross receipts) its $6.5 million advance plus $183,759 in interest, distribution expenses of $2,859,417 (a portion of its total distribution expenses), a distribution fee of $4,289,126, and its 50 percent share (approximately $232,000) of net receipts. Thus, Nelson would have earned a profit exceeding $2.5 million under the terms of its own contract (as of March 31, 1994). However, under the trial court’s ruling, Nelson would incur an out-of-pocket loss of approximately $3.9 million (as of March 31, 1994). As a practical matter, the trial court’s decision means that Nelson would never make a profit from distributing The Last Emperor in the home video market.
 

 [5]
 

 As a corollary to Civil Code section 1589, Civil Code section 3521 states that “[h]e who takes the benefit must bear the burden.”
 

 [6]
 

 The cases cited by the producers are consistent with the rule that Civil Code section 1589 may apply to a party to the original contract, to an assignee of the contract, to a person who accepts all of the benefits of the contract, or to a person who expressly assumes the obligations of the contract. (See
 
 Weidner
 
 v.
 
 Zieglar
 
 (1933) 218 Cal. 345, 348-350 [23 P.2d 515] [plaintiff was bound by obligations imposed on beneficiaries of declaration of trust where he expressly assumed those obligations as an assignee];
 
 Halperin
 
 v.
 
 Raville
 
 (1986) 176 Cal.App.3d 765, 771-772 [222 Cal.Rptr. 350] [son was liable for loans that plaintiff had made to father where money was borrowed for “father/son business” and son had played significant
 
 *363
 
 role in obtaining loans from plaintiff];
 
 Citizens Suburban Co.
 
 v.
 
 Rosemont Dev. Co.
 
 (1966) 244 Cal.App.2d 666, 675-677 & 676, fn. 3 [53 Cal.Rptr. 551] [where corporation acquired all of partnership’s assets, it was bound by contract entered into by partnership regardless of whether documents showed that particular contract was expressly assigned to corporation];
 
 Pecarovich
 
 v.
 
 Becker
 
 (1952) 113 Cal.App.2d 309 [248 P.2d 123] [coach of professional football team could recover under personal services contract against defendant who owned one-half interest in franchise where defendant was “full partner” in the enterprise, assumed the management, control, and operation of the team, and was coach’s “joint employer”];
 
 Walmsley
 
 v.
 
 Holcomb
 
 (1943) 61 Cal.App.2d 578, 580-582 [143 P.2d 398] [sublessee was liable under terms of original lease where he agreed to “take over" the lease and where there was an “executed oral assignment” of original lease];
 
 Woodley
 
 v.
 
 Woodley
 
 (1941) 47 Cal.App.2d 188 [117 P.2d 722] [where father’s will left real property to defendant son upon condition that portion of rental proceeds be paid monthly to other son, defendant’s acceptance of property obligated him to make payments to his brother];
 
 Aeronaves de Mexico, S.A.
 
 v.
 
 McDonnell Douglas
 
 (9th Cir. 1982) 677 F.2d 771, 772-773 [lessee of aircraft was bound by exculpatory clause in warranty provision of purchase agreement where lessee expressly assumed that provision in lease].)
 

 [7]
 

 Just as the cases interpreting Civil Code section 1589 recognize a distinction between an assignment and a license, the landlord-tenant decisions distinguish between an assignment of a lease (which transfers the lessee’s entire interest in the property) and a sublease (which transfers only a portion of the lessee’s interest). (See
 
 Kendall
 
 v.
 
 Ernest Pestaña, Inc.
 
 (1985) 40 Cal.3d 488, 492, fn. 2 [220 Cal.Rptr. 818, 709 P.2d 837] [defining lease assignment and sublease].) In general, an
 
 assignee
 
 of the lessee is liable to the landlord for rent under the original lease (at least for the period of possession), while a
 
 sublessee
 
 is not (absent an assumption of the lease). (See
 
 Hartman Ranch Co.
 
 v.
 
 Associated Oil Co., supra,
 
 10 Cal.2d at pp. 242-246;
 
 Kelly
 
 v.
 
 Tri-Cities Broadcasting, Inc.
 
 (1983) 147 Cal.App.3d 666, 676-679 [195 Cal.Rptr. 303]; 6 Miller & Starr,
 
 op. cit. supra,
 
 §§ 18:55, 18:60, pp. 115-118, 125-127.)
 

 [8]
 

 At some point, Nelson received a copy of those two documents, although it is not clear if it obtained them before entering into the contract with Hemdale. However, on August 17, 1987, before executing the contract, Nelson received a summary of the documentation relating to the chain of title. That summary described the content of the copyright mortgage, stating that Hemdale had acquired from the producers all rights, title and interest in The Last Emperor, including all contract rights.
 

 [9]
 

 For instance, the producers do not contend that the 50/50 net receipts provision in the Hemdale-Nelson contract was unusual in the industry or that it gave Nelson an unbelievably high percentage of the receipts.
 

 [10]
 

 The
 
 Waverly
 
 court did state that the distributor owed a fiduciary duty to the producer to provide an accounting of proceeds received from subdistributors. (See 217 Cal.App.2d at pp. 731, 734.) Here, that duty would govern the relationship between the producers and Hemdale, but it would not extend from the producers to Nelson. In that regard, the producer-Hemdale agreement provided: “Producer shall not have direct auditing rights with respect to such videogram distributor [i.e., subdistributor]; provided, however, that if Hemdale declines to exercise its audit rights under its agreement with such videogram distributor, Producer may require Hemdale to exercise such rights, which Hemdale shall do and failing which Producer may do in Hemdale’s name . . . .”
 

 [11]
 

 For instance, assuming the producers could not have found a main distributor other than Hemdale, they could have sold Hemdale only the theatrical and television rights and entered into a contract directly with Nelson for the home video rights. Alternatively, even with Hemdale as the main distributor in all fields, the producers could have retained the right to preapprove any subdistribution contract and mentioned that right in the UCC-1 and copyright mortgage; they could have included information in the UCC-1 and copyright mortgage about their terms of payment (without disclosing confidential financial data); or they could have simply monitored Nelson’s negotiations with Hemdale more closely and contacted Nelson before it agreed to a final contract.
 

 [12]
 

 We express no view on the appropriate remedy in such a case.
 

 [13]
 

 Our analysis properly focuses on the parties’ conduct and knowledge
 
 before
 
 Nelson executed a contract with Hemdale. After entering into that contract, Nelson was bound thereby unless its performance was excused under one of the theories advanced by the producers. We have concluded that none of those theories applied. Thus, Nelson did not become liable to the producers merely because it continued to pay Hemdale under the subdistribution contract after learning about the content of the producer-Hemdale agreement. Nor did Nelson’s failure to interplead the disputed funds into court make it liable under the producer-Hemdale agreement. (See Code Civ. Proc., § 386.)
 

 [14]
 

 In deciding whether summary judgment for Nelson is proper, we construe the evidence most favorably to the producers (as plaintiffs) and draw all reasonable inferences in their favor. Under that standard, we find that there is no triable issue of material fact. For example, although the producers admittedly distrusted Hemdale, there is no evidence that Nelson did so. Indeed, the “evidence” on that point was supplied by the allegations in the producers’ complaint. While those allegations can be considered in denying the producers’ summary judgment motion, they cannot be used to defeat Nelson’s motion. (See
 
 Foxborough
 
 v.
 
 Van Atta
 
 (1994) 26 Cal.App.4th 217, 222, fn. 3 [31 Cal.Rptr.2d 525];
 
 Kurokawa
 
 v.
 
 Blum
 
 (1988) 199 Cal.App.3d 976, 988-989 [245 Cal.Rptr. 463].) In short, as the producers stated in their brief, “[b]oth plaintiffs and Nelson agreed, and still agree, that there are no material disputed facts applicable to the cross-motions.”