IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 8, 2004 Session

# CHILD BRIDE MUSIC, INC. v. JACKSON, ET AL.

Appeal from the Chancery Court for Davidson County
No. 00-1208-II     Irvin H. Kilcrease, Jr., Chancellor

No. M2002-02789-COA-R3-CV - **Filed April 28, 2004**

Assignee appeals the judgment of the trial court holding it to be bound to a reclamation of rights provision in the contract between its assignor and a grantor of copyright interests. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, and FRANK G. CLEMENT, JR., JJ., joined.

James E. Zwickel, Nashville, Tennessee, for the appellant, Carl Jackson, d/b/a Lonesome Dove Music.

Jay Scott Bowen, Joshua E. Perry, Nashville, Tennessee, for the appellees, Child Bride Music, Inc. and Bobbie Cryner, d/b/a Bobbie Cryner Music.

## OPINION

Bobbie Cryner was a waitress at Cooker's Restaurant in Goodlettsville, Tennessee in 1990 and 1991. Carl Jackson was a performing artist, songwriter and music publisher, d/b/a Lonesome Dove Music. Jackson frequented the restaurant and became acquainted with Cryner. At the urging of certain of Cryner's co-workers at the restaurant, Jackson listened to Cryner perform certain of her own compositions of country music songs and was impressed by her song writing skills. Jackson was, at that time, under contract himself with Famous Music Corporation, a publisher of country music compositions. Jackson took Cryner "under his wing" and negotiated for her a very favorable publication contract with Famous Music Corporation. Jackson was neither a party nor a third-party beneficiary to the ensuing contract between Cryner, d/b/a Bobbie Cryner Music, and Famous Music Corporation. With the knowledge and consent of Bobbie Cryner, Famous Music entered into a separate contract with Carl Jackson, d/b/a Lonesome Dove Music, whereby Jackson was to become

co-producer of Cryner's compositions and owner of fifty percent of the copyrights transferred by Cryner to Famous Music Corporation pursuant to the terms of the Cryner-Famous Music contract.

Certain provisions of the Cryner-Famous Music contract control the outcome of this litigation. These provisions are:

9.      Anytime after three (3) years after expiration of the Term, upon fifteen (15) days written notice from Writer, accompanied by payment to Publisher of one hundred percent (100%) of any sums still unrecouped hereunder, if any, Publisher shall re-assign to Writer all Compositions that have not been commercially exploited prior to receipt of such notice by Publisher. Commercial exploitation, for the foregoing purposes, shall be satisfied for any Composition that has been:

(i)      released for sale to the public on phonograph records, tapes, compact discs or any other "phonorecord" or "sound recording" (as such terms are defined under U.S. Copyright Law) on a "major label," which shall be defined as any record label which either: (A) is distributed by or through one of the major distribution groups now constituted by MCA, CEMA, WEA, Polygram, Sony and BMG, or any subsequently established distribution group of relatively equal stature to the foregoing; or (B) has had a single or album listed in the top ten (10) chart positions on any chart published by Billboard Magazine during the two (2) period[s] prior to release of the recorded product embodying the Composition;

(ii)      synchronized in the soundtrack of either: (A) a theatrical motion picture exhibited to the public; (B) a television program broadcast to the public; or (C) a home video program (as the state of such devices is now known or hereafter devised and developed) offered for sale to the public.

. . . .

26.      One (1) year after expiration of the Term of this Agreement, or upon the Co-Publishing Participation Date, whichever occurs later, and after thirty (30) days written notice from Writer to Publisher ("Notice Period"), Publisher shall assign to Writer and Co-Publisher co-administration rights to all Compositions under this Agreement, but only to the extent that such rights are possessed by Publisher at such time. Notwithstanding the foregoing, as to Post-Term Album Compositions, the foregoing assignment as to each such composition shall occur two (2) years after the date that the album first embodying such composition was released for sale to the public. During the Notice Period described above, Publisher, Writer and Co-Publisher shall compile a schedule of such Compositions, as well as the income share

collectible by Writer and Co-Publisher for each, computed in accordance with this Agreement ("Notice Schedule"). Thereafter, Writer and Co-Publisher shall possess the separate and independent right to collect Writer's and Co-Publisher's otherwise payable shares of each such Composition directly, but only in accordance with the mutually agreed upon Notice Schedule, and Writer, Co-Publisher and Publisher shall then have the joint, exclusive and universal right to administer and exploit the Compositions in any manner whatsoever without the approval of the other, subject to the following restrictions and provisions:

(a)     with respect to each other, Writer, Co-Publisher and Publisher shall each possess only the rights accorded to joint copyright owners under U.S. Copyright law, as well as any other applicable law, other governmental regulation or judicial decision;

(b)     Writer and Co-Publisher may only collect Writer's and Co-Publisher's shares of income specifically identified in the Notice Schedule, and Publisher shall collect all other income generated by the Compositions in accordance with this Agreement and Publisher's Co-Publishing Agreement with Carl Jackson.

Both the Cryner-Famous Music contract and the Famous Music-Jackson contract were executed on October 11, 1991, and certain provisions of the Famous Music-Jackson contract are also important to this controversy.

Such provisions are:

## CO-PUBLISHING AGREEMENT

This agreement ("Agreement") is made and entered into this _11th_ day of October, 1991, by and between FAMOUS MUSIC CORPORATION ("Publisher"), 3500 W. Olive Avenue, Suite 1000, Burbank, California  91505, and CARL JACKSON, doing business as _____ ("Co-Publisher"), 1720 Hickory Trace Drive, Gallatin, Tennessee  37066, shall be deemed effective September 1, 1991.

WHEREAS, PHYLLIS CRYNER MAFFETT, professionally known as BOBBIE CRYNER ("Cryner") doing business as BOBBIE CRYNER MUSIC ("Cryner Music") has entered into an Exclusive Songwriting and Co-Publishing Agreement with Publisher dated October _____, 1991 (the "Cryner Agreement"), which is attached hereto as Exhibit "A"; and

WHEREAS, Co-Publisher is directly responsible for introducing Cryner and Cryner Music to Publisher, and Publisher desires to compensate Co-Publisher for Co-Publisher's role in facilitating the Cryner Agreement;

THEREFORE, the parties hereby agree as follows:

1. Famous hereby assigns to Co-Publisher fifty percent (50%) of the copyright ownership, throughout the universe, that is assigned to Famous by Cryner and Cryner Music under the Cryner Agreement. Notwithstanding such joint copyright ownership between Famous and Co-Publisher, however, the only rights possessed by Co-Publisher respecting such ownership shall be those specified hereunder, although Publisher shall include Co-Publisher's name as a copyright claimant when registering copyrights for the "Compositions" under the Cryner Agreement, and shall exert best efforts to include Co-Publisher's name in all places where Publisher is credited as publisher of the Compositions.

The only other document executed by Bobbie Cryner is an assignment dated December 8, 1993, which was executed at the request of Famous Music Corporation in order to document the transfer of copyright ownership with the Library of Congress. This instrument provided:

For good and valuable consideration, the undersigned BOBBIE CRYNER ("Assignor") hereby assigns, conveys, grants and transfers exclusively to FAMOUS MUSIC CORPORATION ("Assignee") and LONESOME DOVE MUSIC ("Co-Publisher") their successors and assigns, joint ownership in equal shares of the copyright in and to the musical composition presently entitled:
SEE ATTACHED SCHEDULE_____
(the "Composition"), which was written and composed in the following percentages:

Songwriter:                              Creative Percentage:

SEE ATTACHED SCHEDULE

Said assignment is for the maximum term of copyright throughout the world (including any renewals or extensions thereof) available now or in the future under any law, other governmental regulation or judicial decision, but is subject to the terms of the agreement between Assignee and Assignor dated October 11, 1991, and the agreement between Assignee and Co-Publisher dated October 11, 1991.

Executed as of the 8TH day of DECEMBER, 1993.

Among the songs listed in the schedule attached to this assignment was "Real Live Woman," which is at the heart of this litigation.

Neither publisher, Famous Music Corporation, nor co-publisher, Lonesome Dove Music, made any effort to commercially exploit the song "Real Live Woman" during the term of the Cryner-Famous Music contract, and, more than three years after the expiration of the Cryner-Famous Music contract, Cryner entered into a publication agreement with the co-plaintiff in this case, Child Bride Music, Inc. Through the efforts of Child Bride Music, the composition "Real Live Woman" was recorded by Trisha Yearwood and became a commercial success. The Cryner-Famous Music contract having expired by more than three years, Bobbie Cryner exercised her rights under paragraph nine of the agreement to re-claim all compositions from Famous Music Corporation that had not been commercially exploited. Among these compositions was "Real Live Woman."

On September 28, 1999, Famous Music Corporation re-assigned to Cryner the fifty percent interest in all unexploited composition copyrights remaining in its possession following the October 11, 1991 Famous Music-Jackson contract, reflecting the assignment to Jackson of the remaining fifty percent copyright interest in all Cryner compositions. Jackson, believing himself free of the obligations of his assignor under paragraph nine of the Cryner-Famous Music contract, declined to re-assign the remaining fifty percent of copyright interest in these unexploited compositions, including the rights to "Real Live Woman." Child Bride Music and Bobbie Cryner then sued Carl Jackson, d/b/a Lonesome Dove Music for declaratory judgment.[1]

The general rule of the common law as stated in American Jurisprudence is:

> As a general rule, an assignee takes the subject of the assignment with all the rights and remedies possessed by or available to the assignor. However, an assignee of a nonnegotiable chose in action generally acquires no greater right than was possessed by the assignor, and simply stands in the shoes of the assignor. Thus, the assignee is subject to any defense that would have been good against the assignee (sic); the assignee cannot recover more than the assignor could recover, and the assignee never stands in a better position than the assignor.

6 Am. Jur. 2D *Assignments*, § 144 (1999).

This rule in Tennessee dates at least from 1817 as established by *Kennedy v. Woolfolk*, 4 Tenn. (3 Hayw) 195 (1817), wherein Woolfolk, assignee of Bryant, was sued by Kennedy on the purchase money debt originally owed by Bryant. Said the supreme court:

> Neither can it be urged successfully that Woolfolk is not liable to the demand of Kennedy, in the same manner as Bryant was. He has taken the place of Bryant by purchasing his equity. What is that? To be liable to a specific execution as well as to be entitled to one. Kennedy had a right to say take your land and pay me the

---

[1] Jackson counter-claimed for a declaratory judgment relative to alleged Lanham Act violations and tortious interference with contract and requested an accounting, but unless he is successful in avoiding the applicability to him of paragraph nine of the Cryner-Famous Music contract, the issues presented by his counter-claim are moot.

purchase-money.  Bryant could not say, convey me the land and wait for the purchase-money till it suits my convenience to pay you, or run the risk of my insolvency and that of my surety.  Can Bryant, by assignment, place Woolfolk in a situation which he himself could not occupy?  Can he and Woolfolk . . . in the absence of Kennedy, make an agreement which could, in any degree, abridge the existing right of Kennedy?  . . .  Here, most clearly, Woolfolk knew of all the material circumstances relating to this transaction, and that undoubtedly subjects him to all of the equity that Bryant was subject to.

*Kennedy*, 4 Tenn. (3 Hayw) at 199.

In *Third National Bank v. Capitol Records, Inc.*, 445 S.W.2d 471 (Tenn.Ct.App.1969), the bank, in order to secure a $4,000 loan to a country and western singer using the stage name "Bobby Edwards," took an assignment from Capitol Records, Inc. of all royalties due from Capitol to Edwards under a recording and royalty contract.  Capitol agreed to the assignment and agreed, under the provisions of the assignment, to make royalty payments directly to the bank.  In the contract between Capitol and Edwards, however, Capitol was entitled to deduct recording costs before paying royalties.  As it happened, these recording costs exceeded the royalties due Edwards, and there was nothing left for Capitol to pay the bank.  In the ensuing suit by the bank against Capitol Records, the court applied the time honored rule and held:  "The complainant, bank, took the assignment of such contract subject to all of the provisions thereof including provision four which authorized the defendant to deduct such recording cost from royalties earned by [Edwards]."  *Third Nat'l Bank*, 445 S.W.2d at 477; *see also Pac. E. Corp. v. Gulf Life Holding Co.*, 902 S.W.2d 946 (Tenn.Ct.App. 1995); *Binswanger S. (N.C.), Inc. v. Textron, Inc.*, 860 S.W.2d 862 (Tenn.Ct.App. 1993).

It is of little significance that California law controls the outcome of this case, since California has long followed the same common law rule. *W. Oil and Ref. Co. v. Venago Oil Corp.*, 24 P.2d 971 (Cal. 1933); *Childs Real Estate Co. v. Shelburne Realty*, 143 P.2d 697 (Cal. 1943); *Prof'l Collection Consultants v. Hanada*, 62 Cal.Rptr.2d 182 (Cal.Ct.App. 1997); *Johnson v. County of Fresno*, 4 Cal.Rptr.3d 475 (Cal.Ct.App. 2003).

In enforcing a statutory declaration of the common law rule relative to a non-negotiable contract, the Court of Appeal of California held:

The question in this case is not whether there has been an effective transfer or assignment of the debt instruments from E.R.S. to Bank or whether Bank's title to the papers has priority over other claims of title.  Rather the issue in this case is whether the title transferred to Bank is subject to defenses Bestways has against the transferor.  This latter question is answered by Civil Code section 1459 which states that "[a] non-negotiable written contract for the payment of money or personal property may be transferred by indorsement, in like manner with negotiable instruments.  Such indorsement shall transfer all the rights of the assignor under the instrument to the assignee, *subject to all equities and defenses existing in favor of the*

-6-

*maker at the time of the indorsement.*" (Emphasis added.) "The assignment merely transfers the interest of the assignor. The assignee 'stands in the shoes' of the assignor, taking his rights and remedies, subject to *any defenses* which the *obligor* has against the assignor prior to notice of assignment." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 948, p. 844.) Accordingly, Bank acquired the right to payment from Bestways subject to any defenses Bestways had against E.R.S.

*Royal Bank Exp. Fin. Co. v. Bestways Distrib. Co.*, 280 Cal.Rptr. 355, 357 (Cal.Ct.App. 1991).

*Bestways* is a California carbon copy of the same rule that applies in Tennessee.

The claim asserted by Southern is founded solely upon its rights as an assignee under the Sales Listing Agreement. Southern concedes that it was not a party to the Agreement but asserts the right to recover under the Agreement as the Binswanger Company's assignee.

The trial court held, and we agree, that Southern's right to recover under the Sales Listing Agreement is entirely derivative from and dependent upon the rights of its assignor, the Binswanger Company. An assignee of a non-negotiable chose in action, such as a contract, steps into the shoes of his assignor and takes his assignor's rights subject to all defenses which may be asserted against the assignor in an action to enforce the right. *Third Nat'l Bank v. Capitol Records, Inc.*, 60 Tenn. App. 189, 445 S.W.2d 471 (1969). Southern's right to recover under the Agreement in this case is determined by the rights of the Binswanger Company. If the Binswanger Company is barred from recovery, so too is Southern. In other words, if the Binswanger Company does not have shoes, Southern has nothing to step into. We have, after our review of this record, determined that Binswanger was shoeless.

*Binswanger Southern*, 860 S.W.2d at 865-66.

In factual synopsis:

1.  By contract, Bobby Cryner d/b/a Bobby Cryner Music, on October 11, 1991, conveyed to Famous Music Corporation two-thirds of the copyright ownership in all musical compositions written or composed by her, in whole or in part, prior to the date of the contract. She also conveyed to Famous Music Corporation one hundred percent of the copyright ownership of all of her compositions written during the term of the contract.
2.  In paragraph nine of this contract, Famous Music was required, on fifteen days notice any time after three years following the expiration of the contract, to "re-assign to Writer all Compositions that have not been commercially exploited prior to the receipt of such notice by [Famous Music Corporation.]"
3.  By contract of the same date, October 11, 1991, Famous Music Corporation conveyed to Carl Jackson a one-half undivided interest in the copyright ownership vested in it under the

Cryner contract. The Cryner contract was attached as "A" to the Famous Music-Jackson contract.

4. In order to document the transfer of copyright ownership with the Library of Congress, Cryner, on December 8, 1993, executed an assignment of copyright in equal shares to Famous Music Corporation ("assignee") and Lonesome Dove Music ("co-publisher") their successors and assigns, joint ownership in equal shares of the copyright to certain musical compositions including "Real Live Woman." This assignment further provided, "Said assignment is for the maximum term of copyright throughout the world (including any renewals or extensions thereof) available now or in the future under any law, other governmental regulation or judicial decision, but is subject to the terms of the agreement between Assignee and Assignor dated October 11, 1991, and the agreement between Assignee and Co-Publisher dated October 11, 1991."

5. By letter to Famous Music Corporation dated September 15, 1999, Cryner requested, pursuant to the terms of the 1991 Cryner agreement, that Famous Music re-assign to her the copyrights of all of her musical compositions assigned to Famous, which had not been commercially exploited. With this letter, she made payment of all advances paid to Cryner by Famous Music during the term of the 1991 Cryner agreement thereby triggering Cryner's reclamation rights pursuant to paragraph nine of the Cryner contract.

6. On September 28, 1999, Famous Music re-assigned to Cryner the fifty percent of the copyrights on unexploited compositions still retained by Famous Music after the Jackson agreement.

7. Jackson refused to re-assign the remaining fifty percent interest to Cryner.

8. One of these unexploited compositions was "Real Live Woman," which had been recorded by Trisha Yearwood and had attained commercial success.

On these facts, the court is requested to declare the rights of the parties.

The reclamation rights of Cryner under paragraph nine of the Cryner-Famous Music contract are unconditional and are written in unambiguous terms. Jackson was thoroughly familiar with the Cryner contract and, indeed, was responsible for the reclamation language that appears in paragraph nine. Jackson is not a party to the Cryner contract and has no rights thereunder and no obligations thereunder, except the rights and obligations of an assignee "standing in the shoes of" his assignor. The rights of Jackson emanate from the Famous Music-Jackson contract alone as assignee of Famous Music Corporation. His rights can rise to no greater dignity than the rights of his assignor, Famous Music Corporation. As Famous Music Corporation is bound by paragraph nine of the Cryner agreement, so Jackson, as assignee of Famous Music, can acquire from his assignor no greater rights than his assignor has acquired under the contract with Cryner.

Jackson asserts two bases for escaping the common law rule. First, he asserts the applicability of paragraph twenty-six of the Cryner-Famous Music contract. It is clear, however, from the language of paragraph twenty-six of that contract, that only commercially exploited compositions are contemplated. This paragraph provides in part: "During the Notice Period described above, Publisher, Writer and Co-Publisher shall compile a schedule of such Compositions,

as well as the income share collectible by Writer and Co-Publisher for each, computed in accordance with this Agreement." No such schedule appears in the proof, and there can be no "co-administration" or income from compositions that have not been commercially exploited. The proof is clear that, at the time Cryner exercised her reclamation rights under paragraph nine of the Cryner agreement, no effort had been made to commercially exploit "Real Live Woman."

Next Appellant places heavy reliance on *Recorded Picture Company Productions, Ltd. v. Nelson Entertainment, Inc.*, 61 Cal.Rptr.2d 742 (Cal.Ct.App. 1997). This California Court of Appeal decision is less than persuasive and has been isolated by subsequent California decisions. *See Pajaro Dunes Rental Agency, Inc. v. Pajaro Dunes Ass'n*, No. 97CV2516, 2001 WL 1743285 (N.D.Cal. Nov. 1, 2001); *Melchior v. New Line Productions, Inc.*, 131 Cal.Rptr.2d 347 (Cal.Ct.App. 2003).

The facts in *Recorded Picture Company* are intriguing, and it is not difficult to understand the desire of the court to favor the sub-distributor. The plaintiffs in that case were the producers of a motion picture entitled "The Last Emperor." These producers entered into a written agreement with Hemdale Film Corporation granting to the latter theatrical, television and home video domestic distribution rights to the picture, in perpetuity. This contract further provided that, upon delivery of "The Last Emperor" to Hemdale, the worldwide copyright of the picture would be owned by Hemdale or its designee. It was contemplated by the producers that Hemdale would appoint sub-distributors to accomplish the actual distribution. The contract further provided that, after costs and expenses, "[a]ny additional Gross Receipts from Videogram Exploitation shall be divided Thirty Percent (30%) to Hemdale and Seventy Percent (70%) to Producer." It was clear from the proof, however, that producers did not "trust" Hemdale because it was a company that had a reputation of being difficult to collect from and of, forcing those whom it dealt with to engage in costly and time-consuming litigation. For this reason, the agreement further provided that "Hemdale shall instruct the applicable videogram distributor to account directly to Producer for the amounts payable to Producer [i.e., 70% of the gross receipts]." Hemdale then contracted with Nelson Entertainment, Inc. for home distribution of "The Last Emperor" without disclosing to Nelson the producer-Nelson contract provision whereby Hemdale was to require sub-distributors to bypass Hemdale and pay directly to the producers. The reluctance of the producers to trust Hemdale proved prophetic when Hemdale bankrupted and producers then called upon Nelson to pay them seventy percent of gross receipts. Explaining its holding in favor of Nelson, the California Court of Appeal held:

> Here, Nelson was not an assignee of the producer-Hemdale agreement, nor did it accept or receive all of the benefits of that agreement. The producers transferred to Hemdale all domestic distribution rights in "The Last Emperor" - - theatrical, television, and home video - - in perpetuity. The producers also assigned the copyright in the picture to Hemdale. In contrast, the Hemdale-Nelson contract authorized Nelson to distribute the picture in the home video market only; Nelson did not receive the distribution rights for theatrical or television release. Further, Nelson's distribution rights terminated after seven years (and reverted to Hemdale), while Hemdale received the distribution rights in perpetuity. Moreover, Hemdale

retained the copyright in the picture. Under these circumstances, Nelson was a licensee, not an assignee. "A transfer of anything less than a totality of a work is a license and not an assignment." (*International Film Exchange, Ltd. v. Corinth Films, Inc.* (S.D.N.Y. 1985) 621 F.Supp. 631, 635; accord, *Key Maps, Inc. v. Pruitt* (S.D. Tex. 1978) 470 F.Supp. 33, 38-39; Webster's Third New Internat. Dict. (1993) p. 1304, col. 2 [defining "license" as "the grant of some but not all of the rights embraced in a copyright"].)

We decline to adopt the rule proposed by the producers - - that a company must comply with a contract to which it is not a party if it has accepted even a portion of the benefits of that contract through a subsequent, separate agreement with one of the original contracting parties. Such a rule would lead to absurd consequences. For instance, if Nelson had entered into an additional agreement with a different distributor for each state, then those 50 distributors (or, more accurately, sub-distributors) would be separately liable to the producers for the full 70 percent of gross receipts from home video release although each one would have received only a small fraction of that sum. We reject this illogical and unjust result. (See *Stone v. Owens* (1894) 105 Cal. 292, 297-298, 38 P. 726 [creditors who are paid by contractor from proceeds received for work done under construction contract have not received a "benefit" of that contract within the meaning of Civil Code section 1589; to hold otherwise would give section 1589 "an outrageously unjust [ ] effect."].)

*Recorded Picture*, 61 Cal.Rptr.2d at 749-50.

In the United States District Court for the Northern District of California, a defendant sought to escape obligations under an assignment agreement by relying on *Recorded Picture.* In rejecting the assertions of the defendant, the court held:

PDRA argues that it did not receive *all* the benefits of the agreement and, thus, is not bound by *any* of its obligations. In *Recorded Picture Co.*, the court held that the subdistributor of a film was not bound by the terms of a contract between the distributor and the film's producer because the subdistributor did not receive all the benefits of the contract. 53 Cal. App. 4th at 365, 61 Cal.Rptr.2d at 750. The court found that the subdistributor was not even aware of the contract between the distributor and the producer, and that it was merely a licensee, not an assignee, of the copyright in the film. *Id.* at 364, 61 Cal.Rptr.2d at 749. Thus, the court held, it would be unjust to bind the subdistributor to the terms of the contract. *Id.*

Here, in contrast, PDRA was aware of the 1982 Agreement from the beginning, and knowingly operated according to its terms for over ten years. Moreover, PDRA *did* receive the primary benefit of the 1982 Agreement, the right to operate a rental business at Pajaro Dunes.

*Pajaro Dunes*, 2001 WL 1743285, at *8.

-10-

In the case at bar, not only was Jackson thoroughly familiar with the provisions of the Cryner-Famous Music Corporation agreement, he, in fact, negotiated them.

In *Melchior v. New Line Productions, Inc.*, the same division of the California Court of Appeal that had decided *Recorded Picture* was heard again.[2]  The issue involved efforts of an assignee to avoid obligations under his assignor's contract by relying on *Recorded Picture*.  In rejecting the position of the defendant, the court held:

> The case of *Recorded Picture Company [Productions] Ltd. v. Nelson Entertainment, Inc.* (1997) 53 Cal.App.4th 350, 61 Cal.Rptr.2d 742, in which this court reached a contrary result, is distinguishable and not controlling.  In *Recorded Picture Company*, the defendant was not provided with a copy of the plaintiff's original contract. (At p. 358.)  While it knew of the existence of the contract, it had no knowledge of the terms of the contract. (*Id.* at p. 365, 61 Cal.Rptr.2d 742.)  In addition, this court held the defendant was a licensee, not an assignee. (*Id.* at p. 363, 61 Cal.Rptr.2d 742.)  Here, by contrast, New Line was an assignee of the Release Agreement and had knowledge of its terms, making application of Civil code section 1589 appropriate.  New Line was well aware of the burdens of the Release Agreement when it accepted the benefits of that agreement.

*Melchior*, 131 Cal.Rptr.2d at 355.

*Recorded Picture* is clearly distinguishable from the case at bar and, as tacitly acknowledged by subsequent California decisions, is an aberration that should be confined to its peculiar and appealing facts.

Paragraph nine of the Cryner-Famous Music agreement is clear and unambiguous, and, as the assignee of Famous Music, Carl Jackson d/b/a Lonesome Dove Music is bound by it.

Certain matters not necessary to a decision in the case, but which permeated the three-day trial of this case and the dozen-year relationship between the parties, deserve attention.  In its findings at the conclusion of the trial, the Chancellor observed:

> Mr. Jackson, I want to state that throughout these proceedings I've been very impressed with you.  I think your initial contact with Ms. Cryner was one of friendship and you did her a great favor.  I think she recognizes that and I think she's in a very awkward position right now.  Money does a lot of strange things to people.
> You did her a very good job because it worked to your detriment.  And had you had a lawyer looking solely out for you, you might have been able to include language that would have protected the interests you thought you were getting.  But

---

[2]  *Recorded Picture* was authored by Masterson, Judge, with Presiding Judge Spencer and Judge Ortego concurring.  *Melchior* was authored by Presiding Judge Spencer and concurred in by Judges Ortego and Mallano.

after having listened to everything that was testified to and reading the documents and learning a little bit more on my behalf about copyright, I find that I am not able to declare that you have any interest given her right to this reassignment. It may not be fair, but it is the law.

And it is with regret that I issue this opinion. I think that you benefitted Ms. Cryner and it may be that she will recognize that in some fashion in the future. But it is not within the province of this Court to declare otherwise having read the clear terms of the agreement and terms as they were set forth and to which the parties signed.

The record does indeed reflect that Carl Jackson "discovered" a waitress in a restaurant whom he correctly determined to be a talented song writer. As Bobbie Cryner acknowledges, she knew nothing about the marketing of musical compositions, and it was Jackson who took her by the hand and led her through the intricacies of contract negotiations, insisted upon her reclamation rights and marketed her talents in a manner most beneficial to her.

There is an obverse side to this coin, however. Bobbie Cryner had transferred to the producer and co-producer 37 compositions in existence at the time of the October 11, 1991 contract and more than 60 such compositions during the life of the contract. Neither producer or co-producer were under any obligation under the contracts to commercially exploit each of Bobbie Cryner's compositions. The parties must use their best judgments to try to estimate what songs may catch on with the public and what songs may have no commercial value. In their search, a diamond in the rough entitled "Real Live Woman" slipped through the cracks. Producer and co-producer Jackson had every opportunity during the life of the Cryner-Famous Music contract to commercially exploit "Real Live Woman" but declined to do so. In their search for a commercial hit, they might collectively lament their missed opportunity. In the opening lines of a country music commercial success of many years ago, "I Overlooked an Orchid While Searching for a Rose."

The second "whereas" paragraph of the Famous Music-Jackson contract indicates that it is Famous Music, and not Bobbie Cryner, who desires to "compensate" Jackson by the fifty percent copyright assignments. Jackson vigorously asserted in oral testimony that it was always the mutual intent of Bobbie Cryner and Carl Jackson that the Jackson fifty percent interest in the Cryner composition copyrights be unconditional and not subject to the reclamation clause of the Cryner-Famous Music contract. If such were the case, it would have been a simple matter to insert such language in the Cryner-Famous Music contract instead of leaving a completely unambiguous reclamation provision in the contract that allows no exception.

"The court, [in] arriving at the intention of the parties to a contract, does not attempt to ascertain the party's state of mind at the time the contract was executed, but rather their intentions as actually embodied and expressed in the contract as written." *Rainey v. Stansell*, 836 S.W.2d 117, 119 (Tenn.Ct.App.1992). While Jackson was not a party to the Cryner-Famous Music contract, he was thoroughly familiar with it and, in fact, negotiated the very provision embodied in paragraph nine which brings him to grief in this case.

The judgment of the trial court is in all respects affirmed, and the case is remanded for such further consideration as may be necessary.  Costs of the cause are assessed against Carl Jackson.

_____

WILLIAM B. CAIN, JUDGE