[No. B231491. Second Dist., Div. Two. Feb. 6, 2012.]

CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, Petitioner, v. WORKERS' COMPENSATION APPEALS BOARD, NEXT ENTERPRISES et al., Respondents.

1330

COUNSEL

Guilford Steiner Sarvas & Carbonara and Richard E. Guilford for Petitioner.

No appearance for Respondents Workers' Compensation Appeals Board and Next Enterprises.

Jeffrey M. Trombacco for Respondents Oracle imaging, N-Care, Nations Surgery Center and Pinnacle Lien Services.

Charles Edward Clark for Express Pharmacy and Express Care Management as Amici Curiae on behalf of Respondents.

OPINION

**ASHMANN-GERST, J.**—Petitioner California Insurance Guarantee Association (CIGA) seeks review of a ruling by the Workers' Compensation Appeals Board (WCAB) that recognized claims asserted by real parties in interest Oracle Imaging, N-Care and Nations Surgery Center (collectively medical providers) as "covered" claims under Insurance Code section 1063.1.[1] The claims were asserted by real party in interest Pinnacle Lien Services (Pinnacle) on behalf of the medical providers. CIGA contends that it has no obligation to pay because Pinnacle was an assignee of the claims and assigned claims are excluded under section 1063.1, subdivision (c)(9).

■ We granted CIGA's petition for writ of review. We affirm the ruling that Pinnacle is not excluded from pursuing the claims against CIGA for two reasons. First, the facts do not establish that the medical providers assigned their claims to Pinnacle. Second, section 1063.1, subdivision (c)(9) does not exclude the claims from being "covered" because the medical providers are original claimants and Pinnacle is their administrator or personal representative.

## BACKGROUND

Anastasia Jenkins filed a workers' compensation claim against her employer, whose workers' compensation insurance carriers became insolvent during the pendency of the proceedings. Medical services were rendered to Jenkins by real parties in interest the medical providers.

---

[1] All further statutory references are to the Insurance Code unless otherwise indicated.

Each of the medical providers had separately entered into a "Collection Agreement" with Pinnacle, pursuant to which Pinnacle was to provide "exclusive collection services" for accounts "assigned" to Pinnacle by the "client" medical provider. The three agreements were essentially identical, and provided that Pinnacle was an independent contractor and would receive a certain percentage of the amount collected as compensation for its services. Under the agreements, Pinnacle had the discretion to negotiate the amount and terms of payment, subject to approval of the medical provider if the negotiated amount fell below specified percentages. It was not disputed that any insurance payments were to be made by checks payable directly to the medical provider, under its tax identification number.

■ When the workers' compensation insurers became insolvent, CIGA was obliged to assume their obligations. "CIGA was created by legislation in 1969 ([Ins. Code,] § 1063 et seq.) to establish a fund from which insureds could obtain financial and legal assistance in the event their insurers become insolvent, i.e. 'to provide insurance against "loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies." (Ins. Code, § 119.5.)' " (*Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 784 [244 Cal.Rptr. 655, 750 P.2d 297].)

■ CIGA took the position that the claims of the medical providers submitted by Pinnacle were specifically excluded from coverage by section 1063.1, subdivision (c)(9), which provides that covered claims do not include "(B) a claim by a person other than the original claimant under the insurance policy in his or her own name . . . and does not include a claim asserted by an assignee or one claiming by right of subrogation . . . ."

CIGA and real parties in interest submitted the question of whether the claims were barred to the workers' compensation administrative law judge (WCJ), who concluded that they were not barred. CIGA sought reconsideration, again contending that a claim asserted by an assignee is not a covered claim. The WCJ recommended denial of the petition for reconsideration, noting that Pinnacle only represented the medical providers and transmitted the amounts collected to them, while retaining a percentage of the collected sums as payment for its services.

The WCAB agreed and denied reconsideration. The WCAB opined that CIGA had failed to prove that legal title to the medical providers' claims had been transferred to Pinnacle, and therefore there was no assignment but only a delegation of the task of collection to Pinnacle. CIGA has sought review of this determination.

## DISCUSSION

I. *No Assignment of Claims*

" '[I]t is a fundamental principle of law that one of the chief incidents of ownership in property is the right to transfer it.' [Citation.]" (*Essex Ins. Co. v. Five Star Dye House, Inc.* (2006) 38 Cal.4th 1252, 1259 [45 Cal.Rptr.3d 362, 137 P.3d 192].) "This 'chief incident of ownership' applies equally to tangible and intangible forms of property, including causes of action. Originally codified in 1872, [Civil Code] section 954 states: 'A thing in action, arising out of the violation of a right of property, or out of an obligation, may be transferred by the owner.' An assignment is a commonly used method of transferring a cause of action." (*Ibid.*) " 'To "assign" ordinarily means to transfer title or ownership of property . . . .' " (*Recorded Picture Company [Productions] Ltd. v. Nelson Entertainment, Inc.* (1997) 53 Cal.App.4th 350, 368 [61 Cal.Rptr.2d 742].)

An assignment may be complete or partial. "An unqualified assignment of a contract or chose in action, however, with no indication of the intent of the parties, vests in the assignee the assigned contract or chose and all rights and remedies incidental thereto." (*National R. Co. v. Metropolitan T. Co.* (1941) 17 Cal.2d 827, 832–833 [112 P.2d 598].) A complete assignment passes legal title to the assignee who is the real party in interest and may sue in his or her real name. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 732, p. 816.) "A partial assignment of a claim is unenforceable without the debtor's consent, and the assignee ordinarily has no legal standing to sue." (1 Witkin, *supra*, Contracts, § 733, p. 817.)

"An assignment for collection vests legal title in the assignee which is sufficient to enable him to maintain an action in his own name, but the assignor retains the equitable interest in the thing assigned." (*Harrison v. Adams* (1942) 20 Cal.2d 646, 650 [128 P.2d 9].) "Such an assignee has been referred to as the trustee or agent of the assignor . . . , and a fiduciary relationship exists between them." (*Ibid.*, citations omitted.) CIGA does not contend that Pinnacle was granted an unqualified assignment by which it obtained all rights and remedies, but rather a partial assignment with legal title to pursue the medical providers' lien claims.

In determining whether an assignment has been made, "the intention of the parties as manifested in the instrument is controlling." (*National R. Co. v. Metropolitan T. Co., supra,* 17 Cal.2d at p. 832.) " '[A]n assignment, to be effective, must include manifestation to another person by the owner of his intention to transfer the right, without further action, to such other person or to a third person. . . .' " (*Recorded Picture Company [Productions] Ltd. v.*

*Nelson Entertainment, Inc., supra,* 53 Cal.App.4th at p. 368.) ' ■ "The language of a contract governs its interpretation, if the language is clear. (Civ. Code, § 1638.) 'A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' (*Id.,* § 1636; see 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 684, p. 617.)" (*County of San Joaquin v. Workers' Comp. Appeals Bd.* (2004) 117 Cal.App.4th 1180, 1184 [12 Cal.Rptr.3d 406].) The entire contract must be considered, not just isolated parts, and the words of the contract are to be given their usual and customary meaning. (Civ. Code, §§ 1641, 1644; *Sass v. Hank* (1951) 108 Cal.App.2d 207, 215 [238 P.2d 652].)

■ Established rules of contract interpretation apply in workers' compensation proceedings. Here, the agreements provided that each medical provider "is *the sole owner* of accounts receivable for which CLIENT desires PINNACLE to provide collection services." (Italics added.) The agreements also provided that after being in effect for six months, either party could terminate the agreement upon 30 days' notice. Two of the agreements provided that upon termination, the medical provider had the option of taking back previously assigned accounts for a fee, and the other agreement gave the client the right to demand "the reassignment" of specific individual accounts even without terminating the agreement. The agreements described Pinnacle's duties as "exclusive collection services for accounts assigned by CLIENT to PINNACLE." While Pinnacle was given "full discretion to negotiate the amount and terms of payment of CLIENT's accounts," it had to obtain approval from the medical providers to settle accounts for less than specified percentages of the original statement amount. Finally, the medical providers were to remain the custodians of all original records.

CIGA relies on the words "assign" and "reassign" in the agreements to support its position that Pinnacle became the assignee with legal title to the medical providers' claims. But use of the word "assign" is not conclusive. (9 Corbin on Contracts (rev. ed. 2007) § 47.4, p. 139.) CIGA's interpretation of the agreements does not take into account the full context of the agreements. Reading each agreement in its entirety makes clear that the medical providers retained full ownership of their accounts receivable, retained the right to terminate their relationships with Pinnacle and pursue collection efforts themselves, and maintained the right to approve certain settlement amounts. Indeed, the agreements refer to "CLIENT's accounts," not "Pinnacle's accounts." In other words, under the agreements the medical providers retained control of the accounts receivable and the authority to collect. The agreements establish that the medical providers only transferred to Pinnacle the *task* of collecting their accounts receivable, for a fee. Pinnacle was hired to provide collection *services,* nothing more.

CIGA argued that the medical providers only retained "financial control" of the accounts receivable. But this argument ignores the contractual language that the medical providers remained the "sole owners" of their accounts, with the ability to fire Pinnacle and collect on their own. CIGA relies on *Merchants Serv. Co. v. Small Claims Court* (1950) 35 Cal.2d 109, 111, 112 [216 P.2d 846], which found that an assignment resulted where the contractual language included the terms " 'relinquish, disclaim, and quitclaim any right, title or interest in and to the merchandise . . . .' " No such language is used here. Taken as a whole, the language in the agreements does not establish an assignment.

■■■■ Nor does the conduct of the parties support the finding of an assignment. " 'It is the substance and not the form of a transaction which determines whether an assignment was intended. . . . If from the entire transaction and the conduct of the parties it clearly appears that the intent of the parties was to pass title to the [property], then an assignment will be held to have taken place.' " (*Recorded Picture Company [Productions] Ltd. v. Nelson Entertainment, Inc., supra*, 53 Cal.App.4th at p. 368, quoting *McCown v. Spencer* (1970) 8 Cal.App.3d 216, 225 [87 Cal.Rptr. 213].) There was no evidence presented that it was the intent of the medical providers to pass legal title to Pinnacle, or that Pinnacle proceeded as if it had such title. For example, in the three notices and requests for allowance of lien filed with the WCAB, Pinnacle identified the medical providers as the lien claimants and itself as their "representative," a clear indication that it was pursuing recovery of the claims on behalf of the medical providers. Additionally, the evidence showed that any money owed to the medical providers would be paid by check directly to them using their tax identification numbers, and not to Pinnacle. ■■■■ "An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." (Rest.2d Contracts, § 317, subd. (1).) The medical providers did nothing to extinguish their rights to receive payments directly from CIGA. The record supports the finding that the medical providers did not assign their claims to Pinnacle.

II. *The Claims Are Covered.*

■■■■ Section 1063.1, subdivision (c)(9) excludes claims from being "covered" unless they are asserted by an original claimant or, inter alia, its administrator or personal representative. We are called upon to interpret the statute to determine whether the claims at issue are "covered."

## A. *The rules of statutory interpretation.*

██ When interpreting a statute a court should ascertain the intent of the Legislature so as to effectuate the law's purpose. (*People v. Lewis* (1993) 21 Cal.App.4th 243, 247 [25 Cal.Rptr.2d 827].) In ascertaining that intent, a court must " 'first turn[] to the words used. [Citation.] [¶] When statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it. [Citations.]' [Citation.]" (*Ibid.*) Nonetheless, "the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.]" (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) If a statute is susceptible to more than one reasonable interpretation, the court may consider the statute's purpose, the evils to be remedied, the legislative history, public policy, and contemporaneous administrative construction. (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340 [14 Cal.Rptr.3d 857, 92 P.3d 350].) In addition, the court may consider the consequences that will flow from a particular interpretation. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

## B. *"Original claimant."*

██ "Original claimant" is not defined by the Insurance Code. However, the word "claimant" is defined as "an insured making a first party claim or a person instituting a liability claim." (§ 1063.1, subd. (g).) Thus, "original claimant" means (1) original "insured making a first party claim" or (2) original "person instituting a liability claim." In the context of first party insurance, "original claimant" has been construed to mean the original insured. (*Baxter Healthcare Corp. v. California Ins. Guarantee Assn.* (2000) 85 Cal.App.4th 306, 313 [102 Cal.Rptr.2d 87] (*Baxter*).)[2] In the context of third party insurance, "original claimant" has been construed to mean a

---

[2] "[T]he distinction between first and third party claims can be summarized as follows: If the insured is seeking coverage against *loss or damage sustained by the insured*, the claim is first party in nature. If the insured is seeking coverage against *liability of the insured to another*, the claim is third party in nature." (*Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 399, fn. 2 [257 Cal.Rptr. 292, 770 P.2d 704].) *Baxter* did not adhere to this distinction. It involved general liability insurance, which ostensibly implicates a third party claim. But according to *Baxter*, the appellant was seeking indemnity as the owner of various policies and therefore it was making a first party claim. (*Baxter, supra,* 85 Cal.App.4th at p. 312.) The court denied CIGA coverage because the appellant received a transfer of the policies after it acquired the assets of the original insured in a merger. It was noted that the policies were not in the

person who institutes a claim against an insured for liability. (*Black Diamond Asphalt, Inc. v. Superior Court* (2003) 114 Cal.App.4th 109, 120 [7 Cal.Rptr.3d 466] ["Under the unambiguous language of the statutory scheme, an original claimant can be any person (other than an insurer) instituting a liability claim within the coverage of the policy, provided that he or she does so in his or her own name and not through assignment or by right of subrogation."]; *Catholic Healthcare West v. California Ins. Guarantee Assn.* (2009) 178 Cal.App.4th 15, 31 [100 Cal.Rptr.3d 125] ["the phrase 'original claimant under the insurance policy in his or her own name' was included in the statute to limit CIGA's liability to those individuals or entities that were named in the policy as well as members of the public injured by a named insured"].) An original claimant does not have to be the insured.[3]

Under the second definition of "claimant" in section 1063.1, subdivision (g), the person must institute a liability claim. Though "liability claim" is not defined by the CIGA statutes, "covered claim" is defined as an obligation

---

appellant's name and the named insured no longer existed. (*Ibid.*) The holding in *Baxter* is therefore limited to a first party claim by an insured.

[3] *Nowlon v. Koram Ins. Center, Inc.* (1991) 1 Cal.App.4th 1437 [2 Cal.Rptr.2d 683] (*Nowlon*) bolsters our conclusion. An injured employee sued his employer for damages and discovered that the employer's insurer was insolvent and not a member of CIGA. The employer filed for bankruptcy. Seeking a remedy, the employee sued the employer's insurance broker. One issue was whether the employee could have made a third party claim against CIGA if the insurer had been a CIGA member.

The *Nowlon* court concluded that third party claims against CIGA are permitted. It noted that at "the time the CIGA statutes were introduced, the digests accompanying the proposed legislation, Assembly Bill No. 1310, stated that 'Covered claims eligible for payment by the guarantee association are defined as those arising out of policies issued to residents of this state or payable to residents of this state . . . .' [Citation.] A letter from the bill's author conveying the legislation to then-Governor Ronald Reagan for his signature on August 11, 1969, stated that the effect of CIGA was to guarantee that 'all members of the public in California can be assured that their claims will be paid despite the fact that a company may become insolvent.' The letter goes on to note that 'the bill immediately gives relief to claimants and policyholders' of a small insurance company which had declared bankruptcy." (*Nowlon, supra,* 1 Cal.App.4th at p. 1443.) Nonetheless, "section 1063.1 as enacted was ambiguous as to third party claimants. Accordingly, an attempt to clarify the statute was made in 1983 with Senate Bill No. 350, whose stated purpose was to 'make[] clear that "claimant" as used in the statute includes both first and third party claimants.' [Citation.] This task was supposedly accomplished by changing [existing language] . . . to read that ' "Covered claims" shall not include (i) any claim to the extent it is covered by any other insurance of a class covered by the provisions of this article available to the claimant or insured . . .', the underlined addition intended to draw a distinction between insureds who made claims and third parties who made claims." (*Nowlon, supra,* at pp. 1443–1444.) According to *Nowlon,* this "attempt at clarification was apparently not clear enough, prompting yet another amendment to section 1063.1 in 1987. The 1987 amendment added subdivision (g) to [section 1063.1]." (*Nowlon, supra,* at p. 1444, fn. 5.) The court explained that "both the original legislation and its subsequent amendment attempted to define the scope of CIGA as encompassing both insureds and third party claimants. The intent to allow third party claims was present, even if the language used in the statute was not equal to the task of clearly expressing this intent." (*Id.* at p. 1444.)

of an insolvent insurer. (§ 1063.1, subd. (c)(1).) Because a liability claim must be a covered claim to trigger CIGA's protection, a liability claim implicates a liability of an insured that is also the obligation of an insolvent insurer.

In our view, a medical lien under Labor Code section 4903, subdivision (b) is a liability claim. This is because the insured employer has a liability to a medical provider and the insolvent insurer has an obligation to pay. But instead of demanding payment from an insured employer, a medical provider has the option of expediting recovery by asserting a medical lien against the compensation award. If a third party claim is a covered claim, there is no logical reason to exclude a lien claim. Moreover, section 1063.1, subdivision (c)(1)(F) provides that covered claims include the obligations of insolvent insurers "to provide workers' compensation benefits under the workers' compensation law of this state." If a lien was not a liability claim, then the CIGA statutory scheme would not satisfy the definition of a covered claim with respect to the payment of medical expenses.

The medical providers qualify as original claimants. They instituted liability claims by asserting medical liens in the first instance. That they were aided by Pinnacle does not change the analysis. Pinnacle was an agent, and everything it did was solely on behalf of the medical providers.

C. *"Under the insurance policy."*

 To be a covered claim, a liability claim must be instituted "under the insurance policy." That phrase could refer to a contractual claim for policy benefits by an insured employer or employee. But that interpretation only implicates first party claims, and it would render superfluous the language regarding a "person instituting a liability claim." Moreover, case law establishes that third party claims can be covered claims. Thus, "under the insurance policy" broadly encompasses a liability claim that triggers the obligation of an insolvent insurer. And because the law contemplates that a medical provider's lien will be satisfied out of insurance proceeds, we conclude that a medical lien arises "under the insurance policy."

D. *"In his or her own name."*

The original claimant must seek recovery in his or her own name. We conclude that the medical providers met this requirement by instituting lien claims in their own names through Labor Code section 4903, subdivision (b).

E. *"Administrator"; "personal representative."*

 It is notable that a covered claim does not include "a claim by a person other than the original claimant under the insurance policy in his or

her own name, his or her assignee as the person entitled thereto under a premium finance agreement as defined in Section 673 and entered into prior to insolvency, his or her executor, administrator, guardian, or other personal representative or trustee in bankruptcy." (§ 1063.1, subd. (c)(9)(B).) Stated in the affirmative, a covered claim can be asserted by any person who is on that list. Only "a claim asserted by an assignee or one claiming by right of subrogation" is specifically barred. (*Ibid.*) Pinnacle is neither an assignee nor one claiming by right of subrogation. Nor is Pinnacle even making any claims. Rather, Pinnacle is making claims on behalf of the medical providers.

We conclude that Pinnacle fits the definition of "administrator" and "personal representative." While "administrator" is not defined by statute, one of various dictionary definitions is "a person who administers the affairs of an organization." (Dictionary.com, administrator <http://dictionary.reference.com/browse/administrator> [as of Feb. 6, 2012].) Pinnacle was hired by the medical providers to administer their Labor Code liens. Similarly, Pinnacle was hired to represent the medical provider and is therefore a personal representative. Without this interpretation, a lien holder could not use the services of collection agencies.

F. *Conclusion.*

Because the medical providers are original claimants and Pinnacle is their administrator or personal representative, the claims are not barred by section 1063.1, subdivision (c)(9).

## DISPOSITION

The ruling of the WCAB is affirmed. The case is remanded for further proceedings consistent with this opinion.

Chavez, J., concurred.

**DOI TODD, Acting P. J.,** Concurring.—I concur with the outcome. I write separately because I disagree with the majority's conclusion that the medical providers qualify as "original claimants" making "covered" liability claims. In my opinion, Insurance Code section 1063.1, subdivision (c)(9) addresses only claims made by an insured and has no application to a third party claim asserted by a lien claimant under Labor Code section 4903. In other words, lien claims are different than liability claims asserted under an insurance policy.

## I. *The Statutory Lien Scheme*

The Insurance Code recognizes there is an entire body of law governing workers' compensation. The threshold provisions of Insurance Code section 1063.1, subdivision (c)(1) defining "covered claims" includes in paragraph (F) "In the case of a policy of workers' compensation insurance, to provide workers' compensation benefits under the workers' compensation law of this state." (Ins. Code, § 1063.1, subd. (c)(1)(F).)

It is undisputed by the California Insurance Guarantee Association (CIGA) that the medical providers have statutory medical lien claims arising from medical services provided to the injured worker. Medical liens in the workers' compensation system are governed by the Labor Code. (See *Hand Rehabilitation Center v. Workers' Comp. Appeals Bd.* (1995) 34 Cal.App.4th 1204, 1210 [40 Cal.Rptr.2d 734].) Labor Code section 4901 provides, "No claim for compensation nor compensation awarded, adjudged, or paid, is subject to be taken for the debts of the party entitled to such compensation except as hereinafter provided." In other words, "there can be no lien against a workers' compensation award for any kind of debt except as the Labor Code specifically provides." (*Rangel v. Interinsurance Exchange* (1992) 4 Cal.4th 1, 15 [14 Cal.Rptr.2d 783, 842 P.2d 82].) Labor Code section 4903 provides that the Workers' Compensation Appeals Board (WCAB) "may determine, and allow as liens against any sum to be paid as compensation" reasonable medical expenses.[1] (Lab. Code, § 4903; *Hand Rehabilitation Center, supra*, at p. 1210.)

"[Labor Code] [s]ection 4903 itemizes the 'debts' which may be allowed as liens against a compensation award by the appeals board. These two sections [(4901 and 4903)] indicate a clear legislative intent to remove such awards from the operation of the usual remedies available to creditors, to limit and regulate the kinds of debts which may be allowed, and to insure that the award is made available to the injured employee for his recovery and rehabilitation in accordance with the purposes of the act." (*Ogdon v. Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 192, 196–197 [113 Cal.Rptr. 206, 520 P.2d 1022], fn. omitted.) The allowance of liens specifically identified in Labor Code section 4903 is the only exception to the requirement that compensation be paid directly to the injured worker.

---

[1] Labor Code section 4903 allows the following liens: (a) reasonable attorney fees; (b) reasonable medical expenses; (c) reasonable value of the living expenses of an injured employee or of his or her dependents; (d) reasonable burial expenses; (e) reasonable living expenses of the spouse; (f) unemployment compensation disability benefits; (g) unemployment compensation benefits and extended duration benefits; (h) family temporary disability insurance benefits; (i) indemnification granted by the California Victims of Crime Program; and (j) amounts paid by the Asbestos Workers' Account.

Article XIV, section 4 of the California Constitution mandates expeditious, inexpensive and unencumbered payment of compensation to injured workers.[2] Because injured workers and their employers are often ready to resolve the worker's claim for indemnity before resolution of claims by lien claimants, the law grants a lien claimant an independent right to prove its claims in a separate proceeding. (Lab. Code, § 4903.4.) A lien claimant can also initiate the action even if the injured worker never pursues his or her claim. (Lab. Code, § 5501; *Permanente Medical Group v. Workers' Comp. Appeals Bd.* (1985) 171 Cal.App.3d 1171, 1178 [217 Cal.Rptr. 873].) The WCAB "may order the amount of any lien claim, as determined and allowed by it, to be paid directly to the person entitled, either in a lump sum or in installments." (Lab. Code, § 4904, subd. (c).) The WCAB is vested with discretion to determine the reasonableness of the claimed amount (Lab. Code, § 4906), and the priorities among lien claimants (Lab. Code, § 4903).

## II. *Statutory Construction and Legislative History*

The majority has set forth the fundamental rules of statutory construction, and I will not repeat them. But applying these rules here makes clear that the exclusions set forth in Insurance Code section 1063.1, subdivision (c)(9) do not include situations involving *qualified or partial assignment*; *collection agreement by a collection agency or attorney*; *or a company administering lien claims for another company*. The commonsense interpretation is that section 1063.1, subdivision (c)(9) has no application to a third party claim asserted by a lien claimant under Labor Code section 4903.

The legislative history supports this conclusion. "To determine the most reasonable interpretation of a statute, we look to its legislative history and background." (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332 [104 Cal.Rptr.3d 219, 223 P.3d 77], citing *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 543 [67 Cal.Rptr.3d 330, 169 P.3d 559].) CIGA was created in

---

[2] California Constitution, article XIV, section 4 provides that "[t]he Legislature is hereby expressly vested with plenary power, unlimited by any provision of this Constitution, to create, and enforce a complete system of workers' compensation, by appropriate legislation, and in that behalf to create and enforce a liability on the part of any or all persons to compensate any or all of their workers for injury or disability, and their dependents for death incurred or sustained by the said workers in the course of their employment, irrespective of the fault of any party. . . . [T]he administration of such legislation shall accomplish substantial justice in all cases expeditiously, inexpensively, and without incumbrance of any character; all of which matters are expressly declared to be the social public policy of this State, binding upon all departments of the State government."

1969 on an "urgency" basis at the request of the Department of Insurance "for the immediate preservation of the public peace, health or safety" following the insolvency of insurers that had provided workers' compensation insurance policies "to persons of modest means." (Assem. Bill No. 1310 (1969 Reg. Sess.) as amended Aug. 1, 1969, § 5.) The 1969 legislative history of Insurance Code section 1063.1 does not include any discussion of the term "assignee," but the statement of intent describes the need to deal with the "extreme hardship" upon "insureds, claimants, public agencies and the public at large." (Assem. Bill No. 1310 (1969 Reg. Sess.) as amended Aug. 1, 1969, § 5.) While the meaning of the word "claimants" is not defined in this statement of intent, the term is used as a category separate from "insureds." Because the lien claim process under the Labor Code was already in effect at the time section 1063.1 was enacted, we may reasonably presume that the Legislature was aware of the process by which medical lien claimants utilized third parties to assert their claims. There is nothing in the legislative history to show that the Legislature specifically intended to exclude claims by workers' compensation lien claimants who utilize collection agencies for processing their CIGA claims, or that the Legislature considered such arrangements to be assignments that were not covered claims under CIGA.

The legislative history is notably silent with respect to any potential impact on the role that collection agencies play in the processing of workers' compensation claims, or with respect to the manner in which injured worker's claims for medical services should be processed under CIGA. The bill's sponsor, the Department of Insurance, did not describe any problems relating to this process. If the Legislature had intended to prohibit the use of collection agencies in processing CIGA claims, such prohibition would have most likely generated significant opposition or at least concern and discussion. The legislative history does not document any such opposition or concern.

Insurance Code section 1063.1 has been amended several times since 1969, most recently in 2010. We have not been made aware of any problems arising from having collection agencies pursue medical lien claims, and assume that had there been problems, the Legislature would have addressed them. As the court stated in *California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2005) 128 Cal.App.4th 307, 316 [26 Cal.Rptr.3d 845], "if the Legislature had wanted to make an exception for workers' compensation claims from [section 1063.1], it could and would have said so." (See also *California Ins. Guarantee Assn. v. Argonaut Ins. Co.* (1991) 227 Cal.App.3d 624, 634 [278 Cal.Rptr. 23] ["In our view, if the Legislature views workers' compensation as significantly different from other insurance so as to necessitate different treatment in recovering claims from CIGA, the Legislature can say so.

Insurance Code section 1063.1 shows that the Legislature knew how to make an exception for workers' compensation benefits when it so intended." (fn. omitted)].)

III. *Insurance Code Section 1063.1, Subdivision (c)(9) Does Not Apply to Lien Claims*

Based on the above, I believe that third party lien claims are different from third party liability claims asserted against an insurance policy. The fundamental differences between lien claims and liability claims are: (1) The lien claimant has performed a service for which it is entitled to be paid, while a claimant under an insurance policy has sustained an injury for which it may or may not be compensated under the insurance policy; (2) A workers' compensation lien is asserted against compensation to be paid (Lab. Code, § 4903), while a claim against an insurance policy is made against the policy; and (3) A lien obligation is not based on a contractual relationship; rather, it is an obligation imposed by law, while obligations arising from an insurance policy are contractual in nature. In light of these distinctions, I believe that lien claims are entirely different from insurance policy claims, and as such should be treated differently from claims made against an insurance policy.

None of the cases upon which the majority relies involved lien claims. *Black Diamond Asphalt, Inc. v. Superior Court* (2003) 114 Cal.App.4th 109 [7 Cal.Rptr.3d 466] involved an indemnity claim asserted between defendant tortfeasors; *Catholic Healthcare West v. California Ins. Guarantee Assn.* (2009) 178 Cal.App.4th 15 [100 Cal.Rptr.3d 125] dealt with the problem of successor corporations and whether successors were "original claimants"; and *Nowlon v. Koram Ins. Center, Inc.* (1991) 1 Cal.App.4th 1437 [2 Cal.Rptr.2d 683] involved a negligence action by an injured employee against a liability broker. Although the majority quotes at length from *Nowlon*, that case simply noted in dicta that Insurance Code section 1063.1, subdivision (g) would allow an injured employee to bring a third party claim against CIGA. Moreover, in *Baxter Healthcare Corp. v. California Ins. Guarantee Assn.* (2000) 85 Cal.App.4th 306, 313 [102 Cal.Rptr.2d 87], the court stated: "CIGA's contention that 'original claimant' means 'original insured' is the only rational way to read the phrase 'original claimant under the insurance policy in his or her own name.' Any other reading of the statute would do violence to the phrase." (*Ibid.*) I agree with this conclusion, and therefore disagree with the majority that the medical providers are original claimants

asserting liability claims. Because a lien claim is fundamentally different from a liability claim, Insurance Code section 1063.1, subdivision (c)(9) simply does not apply to the medical lien claims asserted here.